# OCTOBER TERM, 1911.*

## JONES v. PERE MARQUETTE RAILROAD CO.

1. RAILROADS — OPERATION OF TRAINS — NEGLIGENCE OF DISPATCHER

    It was not negligence on the part of a train dispatcher to direct a regular train to proceed, after having informed a subordinate in charge of the local yard and the movement of trains, that the regular passenger train would not run over that portion of the line but would detour, where the train dispatcher had the right to expect, if any other train was permitted to proceed on the time of the passenger train, its crew would obey all rules and requirements of the company, which, if followed, would protect both trains.

2. SAME—EVIDENCE—RULES.

    • The meaning of printed or written rules and bulletins of a railroad corporation for the guidance of its employés is for the court unless some ambiguity is involved, and opinion evidence is not admissible to show their meaning.

3. SAME—LOCOMOTIVES—TRAINS—WORDS AND PHRASES.

    Under provisions of defendant's rules that the word train should be understood to apply to an engine or more than one engine coupled, with or without cars, etc., a freight engine and its tender were included in a rule forbidding north-bound trains to use the south-bound track of a double-track system.

4. SAME—VIOLATIONS OF RULES—NOTICE.

    A rule forbidding north-bound trains to use the south-bound track was not shown to have been changed by a custom to use the track inconsistently with such rule, under evidence that yard engines used both tracks in either direction, under the direction of a yardmaster, but not on the time of regular trains, and under special precautions for protecting them, or that a dummy train was permitted by authority to use the south-bound track in running north, or that passenger and freight engines took the left track to go to the roundhouse; defendant employing a man to see the rules were obeyed, so

* Continued from Vol. 167.

far as possible, and keeping the rules and bulletins posted in conspicuous places. MOORE and BLAIR, JJ., dissenting.

5. SAME.
It is only where the defendant has sanctioned a custom to violate its rules that they will be deemed abrogated.[1]

6. SAME.
Plaintiff was guilty of contributory negligence in using the south-bound track to go north with his locomotive. MOORE and BLAIR, JJ., dissenting.

7. WITNESSES — EVIDENCE — ADVERSE OR HOSTILE WITNESS — STATUTES.
Under Act No. 307, Pub. Acts 1909, permitting a party to call for cross-examination agents and employés of the opposite party, the testimony of defendant's employés or servants so introduced by plaintiff was a part of his case, and the witnesses were not defendant's witnesses.

Error to Kent; Perkins, J. Submitted January 4, 1911. (Docket No. 16.) Resubmitted October 17, 1911. Decided December 29, 1911.

Case by Clarence Jones against the Pere Marquette Railroad Company for personal injuries. Judgment for plaintiff. Defendant brings error. Reversed and no new trial ordered.

*Bills, Streeter & Parker* (*Charles E. Ward*, of counsel), for appellant.

*Charles G. Turner* and *M. A. Nichols*, for appellee.

OSTRANDER, C. J. The plaintiff, formerly a railroad engineer on the defendant's railroad, was injured in a collision between his engine and a passenger train known as No. 8, running between Grand Rapids and Chicago. The collision occurred in defendant's yard near Grand Rapids, known as "Wyoming yard." Defendant's track was a double main track, running southerly from Godfrey avenue or thereabouts at Grand Rapids through Wyoming yard to a point where the Lake Shore road crosses defend-

---

[1] Duties of master and servant as to rules promulgated for conduct of business, see notes in 43 L. R. A. 306, 10 L. R. A. (N. S ) 772.

ant's road.  Beyond that it was a single track.  A double-track main also existed on the Detroit branch, extending from Oakland to or near Oakland avenue, where it connected with the Chicago line.  A Y extended from the Detroit line to a switching station, known as "Sunny Side," upon the Chicago line, over which freight trains on or for the eastern branch go to and from the Wyoming yard, which was located a mile or so southwest of Sunny Side.  A half a mile or more southwest from Sunny Side, and at the north entrance of Wyoming yard, was another switchman's station, known as "Plaster Creek."  Wyoming yard extended a mile south of Plaster Creek, and a short distance south of the south entrance to the yard, perhaps a quarter of a mile or more, was the Lake Shore crossing.  At each end of the yard, and also at Sunny Side, was a cross-over, used for engines and trains to cross from one main to the other.  The rule of the road was to use the right-hand main.  All trains going south were expected to take the westerly track and north-bound trains the easterly track.  On the night of the collision plaintiff approached Sunny Side from the east about 11:35 p. m., and this was five minutes after the regular time for No. 8 to leave Grand Rapids for Chicago, which he knew, and he also knew that No. 8 had the right of way over his train.  He accordingly inquired of the switch tender where No. 8 was, or if it had gone, or made some other similar inquiry, and was informed that No. 8 was not going over this road that night, but was going to detour over the Grand Rapids & Indiana and Michigan Central, owing to a washout at Saugatuck, some 40 or more miles southwest of Grand Rapids.  He accordingly proceeded.  The switch was thrown, and he entered upon the north-bound main, protected in crossing from both ways by the target, which, when thrown, showed to all trains on the main line that such mains were blocked.  Knowing that they were upon the time of No. 8, and having no written order in relation to No. 8, his train, after crossing the north-bound main to the south-

bound main, proceeded south with due caution; *i. e.*, the conductor stood on the rear platform with the proper lights and fuses, as required by rule 99, ready to use the same upon the appearance of any train following. Plaintiff proceeded down to Plaster Creek, expecting to then take a switch at the north end of Wyoming yard. The Plaster Creek switchman stopped him, and gave him information that the yardmaster directed that he go south through the yard and back in on a switch, and this he did, and the switchman testified that he watched his rear lights all the way down, and saw that he backed in "clear." While he was executing this maneuver—*i. e.*, backing in—the target at the south end was thrown by his brakeman or the yardmaster, thus protecting him against trains from both directions, as it indicated that the mains were blocked. His train being safely on the switch, it remained for him to take his engine to the roundhouse. He therefore backed out onto the south-bound main, and, had he followed the rule to use the right main, would have run south about three car lengths to the cross-over, and gone over that to the north-bound main, which the yardmaster expected him to do, as he said he would set the target on that main against any train from the west. Instead of doing so, after getting clear of the switch, plaintiff started north on the south-bound main. His conductor had left the rear of the train and started to walk up to the Wyoming office, situated about midway of the yard, taking the south-bound main to avoid the danger of being run down by any engine or train from the south, upon the assumption that only south-bound engines or trains would be on that track. He had a narrow escape from being run down by plaintiff's engine. Meantime No. 8 had received no order to detour, but, instead, a clearance order over defendant's own road, and, although plaintiff saw the headlight coming, he supposed it was a dummy that made regular trips to Wyoming station, and kept on. This resulted in a collision, in which both engines were wrecked, plaintiff

was injured, his fireman killed, and one or more of the crew of the passenger engine and several passengers were injured. An inquest was held over the remains of plaintiff's fireman, and plaintiff was a witness, and stated one or more times, in describing how the accident occurred, that he was on the wrong main, and was run into by No. 8, which he had supposed was going to detour. Afterwards plaintiff brought this action and recovered a verdict and judgment for $15,000 for his injuries, and the defendant has appealed.

If the foregoing statement were all there is to this case, it would seem that, not only was the plaintiff guilty of contributory negligence, but that there would be more reason for his being before the court as a defendant than plaintiff at the suit of all of the injured members of the two train crews and passengers, if he was fortunate enough, as he seems to have been, to avoid a charge of manslaughter, as it clearly appears that he deliberately violated the written rule of the company in proceeding north with his engine on a south-bound main, knowing both the rule and the fact that he was on the time of No. 8 south bound, which he knew was, as the sequel proved, a most hazardous thing to do under ordinary, or for that matter unusual, circumstances, against which the rule was plainly designed to provide and protect, and for which violation he was liable to a fine of $25 and three months' imprisonment under the general laws of this State, "and any conductor, engineer, servant, or other employé of any such railroad corporation, who shall knowingly violate any of the printed or written rules or regulations of such company, shall be subject to a fine of not less than twenty-five dollars nor more than one hundred dollars, or to an imprisonment in the county jail not more than three months, or both such fine and imprisonment, in the discretion of the court" (2 Comp. Laws, § 6286), of which he was advised by the book of rules in his possession. The excuse made for his misconduct was his own convenience in avoiding the delay of

having a few switches thrown and the alleged custom of disobeying or disregarding the rule that all trains should use the right-hand main, together with his belief that No. 8 would detour, upon which belief the rules clearly forbade his relying without taking the precautions provided and required by rules and bulletins.

The negligence alleged and relied on is that the train dispatcher, after informing the yardmaster that No. 8 would detour, sent the train out from Grand Rapids some 35 or more minutes later without first notifying the yard office of his intention to do so. The plaintiff could not have known it had this been done, as he and the yardmaster were half a mile from the office at that time.

The undisputed facts are: That for several days a weak bridge at Saugatuck, some 40 or more miles west of Grand Rapids, had made it necessary to detour No. 8 via Grand Rapids & Indiana and Michigan Central roads; and, while on this evening orders were given to hold No. 8 for a time in the hope that it might avoid the detour, it was expected that the train would detour. Knowing that No. 8 had detoured on previous days, and with a view to the entrance of plaintiff's train, which he expected to arrive soon, the yardmaster telephoned the dispatcher to know what was to be done with No. 8, and was informed that it would detour. This was about 11:15. He thereupon informed the switchman at Plaster Creek of the fact, and directed him to inform plaintiff not to take the switch at the north end of the yard, but to proceed south through the yard and back in from the south. We have seen that the switchman at Sunny Side was also informed that No. 8 would detour. Hence he informed plaintiff, and he proceeded via south main to the south end of the yard by direction of the Plaster Creek switchman, where he found the yardmaster awaiting him. He entered upon the south-bound main at 11:35, being about five or ten minutes before the regular time for No. 8 at Sunny Side, by direction of the yardmaster through the switchman. Meantime No. 8 was being held in the hope that she

might proceed via the Pere Marquette line, and at about 11:50 clearance orders were given, and the train departed with the result above stated. We must therefore inquire whether this was negligence in the train dispatcher.

The proposition is that, having stated to the yardmaster that No. 8 would detour, it was negligent to send the train out without informing the yardmaster of the change before doing so. This will depend upon the printed rules and bulletins and the practice of the road and what the dispatcher had a right to understand and expect. The bulletins and rules were in writing, and the plaintiff, yardmaster, and switchman all had copies of the latter. Their meaning was a question for the court, and a large amount of opinion evidence as to their meaning was erroneously admitted. The dispatcher had a right to expect that the rules and bulletins would be obeyed by all. Assuming that he knew when he told the yardmaster at 11:20 that the train would detour, that the yardmaster would admit plaintiff's extra freight into the yard on the time of No. 8, which he did at 11:35, he knew that, if the rules should be obeyed, the only thing that could happen would be the delay to No. 8 which might be caused thereby. The reason for saying this is that he knew that No. 8 could not pass the Sunny Side switch without the signal required to be given by the switchman, who would be acting under rules 590 and 591, and would not "give the proceed signal unless all was right." He knew, also, that the same would be true at the Plaster Creek switch. Furthermore, he knew that, in the event of the failure of the switchman to block No. 8 if necessary, the plaintiff's train would be protected by its conductor under rule 99, as was done, and that in executing the switching movement at the south end of Wyoming yard the plaintiff's train would be protected by the south board, which it was the engineer's duty to cause to be displayed until he was "in clear" on the switch. So far the plaintiff had acted in obedience to the rules and the directions of the yardmaster, and no harm had befallen him. The Plaster Creek switchman,

who could see the entire length of the yard, had seen his lights go off from the main line before No. 8 passed his switch. His conductor had stood at his post, fuses in hand, and lamps burning, until the train was out of danger. Then, his work done, he started for the yard office, leaving the engineer to take his engine to the roundhouse, which he could have done without going upon the main track, or by way of the north-bound main, under protection of the yardmaster. At this point he departed from the rules. It is a significant fact that there is no evidence that any other engine was on either main, not even a yard engine. All were "in clear" because they were on the regular time of No. 8. Even the dummy, which was scheduled to run every 40 minutes or so, was safely sidetracked, awaiting No. 8 or such other train as might be sent out on her time; for, if No. 8 detoured, it would leave the towns between Grand Rapids and Saugatuck without train service unless another train should be sent over that portion of the road, as was sometimes done where trains detoured. It is manifest that, if the rules were obeyed, the dispatcher would have a right to assume that any train going south would be under protection, and that no train would be coming north on a south-bound main on the time of No. 8, and it is clear that, having a right to proceed on the theory of obedience to the rules, he cannot be said to have been negligent in giving a clearance order at 11:55 without first calling up the yard office, and seeing that the west main was clear. See *Veit* v. *Railroad Co.,* 150 Mich. 366 (114 N. W. 236), where we said:

"The train dispatcher was not chargeable with notice that if the crew of No. 42 returned to Mesick, as he expected they might, they would disregard the well-understood rules made largely for the protection of their own lives. He had a right to rely upon the observance of the rules by the trainmen, and to give his orders upon that basis. There is no evidence in this case to affect the right of the dispatcher to rely upon an observance of the rules, without which reliance he could not conduct the train movements of the road."

See, also, *Enright* v. *Railway Co.*, 93 Mich. 409, 412, 413 (53 N. W. 536); *Whalen* v. *Railroad Co.*, 114 Mich. 512, 524 (72 N. W. 323).

Plaintiff's counsel appear to have recognized the force of this, and, to avoid such conclusion, attempt to convince the jury, first, that these bulletins did not apply to light engines because they mentioned trains only, and engines were not trains, and therefore there was nothing prohibiting such engines from using the left mains; and, second, that this engineer did not violate the bulletin because he did use the right-hand track when taking his train through the yard, and it was the same track when he returned with the engine, and therefore he was still using that same right-hand main. That the word "trains" included light engines other than yard engines appears from the first definition in the book of rules, viz.:

"Train—An engine, or more than one engine coupled, with or without cars; displaying markers."

The other proposition requires no discussion. The main contest, however, centers in the claim that, by reason of the custom, the plaintiff had the right to go north on the south-bound main on the time of No. 8, believing that it would not run.

We have examined the rules and bulletins, and we hold *first*, that they are to be construed by the court, and opinion evidence as to what they meant was not admissible; *second*, that under these rules No. 8 was not annulled by the telephone message to the yardmaster, or in any other way, and the plaintiff had no right to consider it so; *third*, that, whether supposed to be annulled or not, the bulletins forbade plaintiff to run his engine north on a south-bound main on the time of a regular train, or, for that matter, at any time; *fourth*, the evidence, such as it was, that it was the custom to run trains north on the south-bound mains, consisted of the following:

(*a*) The yard engines were used on both mains in both directions. This was permitted under the direction of the

yardmaster when not on the time of regular trains and they were properly protected.

(*b*) The dummy ran from near Union Station to Wyoming yard station on the south-bound main. There being no cross-over at that point, it backed up to the cross-over at Plaster Creek. Both of these were allowed by authority, and cannot be considered as an abrogation of the general rule that "trains will use the right-hand track" and run with the course of traffic.

(*c*) Testimony of the plaintiff and one or two other witnesses that they had seen passenger and freight engines take the left-hand track to go to the roundhouse.

This testimony was meager, and was contradicted by several witnesses who were in a position to know. It did not justify an inference that the defendant knew and consented to the abrogation of this general rule, leaving engineers and trainmen to use either track at will. It is inconsistent with the object of a double track. Moreover, it appears that those bulletins are kept posted in conspicuous places, and the rules require that they be read by the engineers before every trip. Again, a man was employed whose duty and business it was to instruct new men as to the rules and bulletins. Again, the plaintiff admitted that he knew it was his duty to report infractions of these rules, and he did not do it when he saw them, thereby indicating the bad faith of all these claims. We should grant a new trial if for no other reason than that the judgment was contrary to the evidence.

The plaintiff's case reached a point upon the trial where it was made to turn on the proposition that the rule requiring engineers to use the right-hand main was abrogated by the tacit assent to a custom so common and general as to justify the conclusion that the managing officer having the making and abolition of rules knew of and approved the violation. Counsel for plaintiff cite the case of *Fluhrer* v. *Railway Co.*, 121 Mich. 212 (80 N. W. 23), as sustaining the rule upon which they rest this point. That was a case where a brakeman was injured in coupl-

ing cars.   Mr. Justice Grant there said, with the approval of his associates:

  " It is well settled that a violation of the rules of the company will defeat recovery.   The exception to this is where the company itself has sanctioned the custom of its employés to act in violation of the rules, and has thus virtually abrogated them.   This exception is based upon the theory that it would be unjust in employers to establish rules, and then sanction their violation, and interpose such violation as a defense.   *Hunn* v. *Railroad Co.*, 78 Mich. 513, 526 (44 N. W. 502, 7 L. R. A. 500); *Eastman* v. *Railway Co.*, 101 Mich. 597, 602 (60 N. W. 309).   Fairly construed, the above rule is notice to brakemen not to enter between the cars while in motion, to uncouple them, and an agreement not to do so.   The danger in doing so is apparent.   Only when this rule is violated by brakemen so universally and notoriously that it is a fair inference that the company sanctioned and approved the violation is the company barred from this defense.   The court instructed the jury that if they believed that the motion of the cars was so slow that it was not negligence to pass between them to uncouple them, and that such was the usual custom of brakemen under like circumstances, then such act would not necessarily prevent recovery by the plaintiff.   There was evidence tending to show that it was usual and customary for brakemen to pass between the cars while in motion to uncouple them.   The case was not submitted to the jury upon the theory that the company had sanctioned a violation of this rule.   The question was not referred to in the instructions.   Under the instructions given, this rule was virtually thrown out of consideration, and the jury permitted to find that, if it was customary for brakemen to do this, then it was not negligence on the part of the deceased.   Custom alone is not sufficient. It was held in *Glover* v. *Scotten*, 82 Mich. 369 (46 N. W. 936), that where a safe place was provided for switchmen to ride, and they chose to ride in a more dangerous one, and always did so, that would not relieve them from contributory negligence.   When the defendant had entered into the contract with the deceased, in which he acknowledged the receipt of a copy of these rules, and agreed to abide by them, it had met the plaintiff's case, even though it was not negligence *per se* to go between the cars when in motion.   The *onus probandi* was then cast upon the

plaintiff to show that the company sanctioned a departure from the rule by a custom so universal and notorious that the company was presumed to have had knowledge of it and to have ratified it."

The later case of *Nichols* v. *Railway Co.*, 125 Mich. 394 (84 N. W. 470), was reversed for the reason that the court erred in his instruction upon this subject. In the case of *Ball* v. *Hauser*, 129 Mich. 401 (89 N. W. 50), we said:

" Whatever we might conclude, were it necessary to pass upon the question, it is apparent from the cases cited that, even in railroad cases, recovery is permitted only when the testimony shows that the rule has been abrogated, and this may be inferred from the circumstances fairly establishing it. If that rule should be applied to this class of cases, we must inquire whether this proof warrants such a conclusion. The plaintiff claims that his proof does warrant it, because he has shown by testimony that some of the men have been in the habit of riding on the elevator; that one of the defendants had seen it done without remark; that he rode on the elevator himself; and that in taking up some kinds of freight it was necessary that a man should ride.

" The fact that some of the men rode down upon the elevator, even if occasionally seen by the defendants without remark, is not inconsistent with the claim that said rule was relied on, and not abrogated. Neither does the fact that one of the defendants rode upon it indicate an intention to permit the men to do so. Nor does the fact that it was necessary for men to ride up occasionally with bulky articles, if it was necessary, establish the abrogation of the rule. Even if it could be said to justify the plaintiff in riding up, it does not tend to show a consent that he should unnecessarily ride down in violation of the rule, which he must have understood from the notice, and which, if the testimony of other witnesses is true, he was repeatedly warned against doing. We think the testimony offered does not establish the claim that the defendants sanctioned such use of the elevator. Not only does this testimony not prove it, but much evidence tends to disprove it. The defendants are not shown to have found it necessary to send men up on the elevator with their materials, or that they expected that Nordella & Owen would do so. They stationed a man at the top to receive material, a

part of whose duty it was to warn men against riding down, which he is shown to have done repeatedly. The engineer below performed a similar duty at defendants' direction; and the defendants at different times told men not to ride upon the elevator. The witness Brogden says that he repeatedly told Ball to keep off from it, and that he was in the habit of jumping on while it was in motion. It was the general custom for the men to go up and down on the ladders provided for the purpose. None of these things was disputed, except that Ball denies being warned to keep off, thereby contradicting several witnesses. This denial raised a question of fact as to that point, and we must therefore assume that he was not warned; but that, and the fact that he and others sometimes rode, do not prove that the rule was abrogated by defendants' sanction, nor did it warrant the judge's leaving the question to the jury. The undisputed proof shows that the defendants were insisting upon their rule. It was not their duty to hire men to warn others not to disobey a known direction; yet they did it. One warning would ordinarily be enough; yet these defendants not only kept the printed notice up, and men to enforce it at each end of the route, but themselves sometimes reproved men who still persisted in riding. An employer ought to have some rights which his employés are bound to respect. There is nothing to compel them to afford elevator transportation, or to preclude their providing for carrying freight to the exclusion of passengers without being liable to such as shall insist on riding in violation of instructions."

In the present case, as in that, there was an absence of testimony that defendant's officers who manage and make rules knew or ever heard of any violations of the rule. They persisted in handing out their rules and keeping the bulletins posted, and, as in the other case, they kept a man whose duty it was to see that they were obeyed so far as possible. There was a failure to show an abrogation of this rule, and the court should have so instructed the jury.

The law requires the making of regulations and rules by railroads. It punishes men who disobey them by fine and imprisonment. It is a startling proposition to men who travel on railroads that a regulation requiring engineers to observe the common rule of the road and keep to the

right track may be disobeyed with impunity whenever an employé may have reason to think a particular train will not run, and not only that, but, after causing the death of one, painful injury to several, and wrecking his employer's property and subjecting it to the payment of damages to its passengers, he may still sue the employer and recover large damages upon the theory that his criminal disobedience was invited by reason of the employer's failure to anticipate and provide against it by taking him into its confidence, to the general demoralization of its business. Railroading is a matter of minutes and seconds. A dispatcher's office must depend upon rules and the obedience of station agents, telegraphers, engineers, conductors, and switchmen. Great care is taken to protect the public against the consequences of disobedience or mistake. The rules do not permit an engineer to go unprotected on the time of a regular train, even though he has reason to believe it will not run. He is still required to protect against accident by obeying the rule, and it is made criminal to do otherwise. Written rules of railroad companies cannot be treated as abrogated by such railroad companies on testimony tending to show nothing more substantial than insubordinate and unreported criminal disobedience on the part of some of the employés. This is simply a case of "taking a chance," whereby many others "were made to take chances."

There is another question that we refer to, not because it is necessary to a disposition of this case, but because it has arisen in other cases. It involves the statute (Act No. 307, Pub. Acts 1909), which provides:

"An act to authorize parties litigant, when they call as witnesses in their behalf the opposite party, employé or agent of said party, to cross-examine such witnesses, and providing that they shall not be bound by their answers.

"The People of the State of Michigan enact:

"SECTION 1. Hereafter in any suit or proceeding in any court of law or equity in this State, either party, if he shall call as a witness in his behalf the opposite party, employé

or agent of said opposite party, or any person who at the time of the happening of the transaction out of which such suit or proceeding grew, was an employé or agent of the opposite party, shall have the right to cross-examine such witness the same as if he were called by the opposite party; and the answers of such witness shall not interfere with the right of such party to introduce evidence upon any issue involved in such suit or proceeding, and the party so calling and examining such witness shall not be bound to accept such answers as true."

It was the claim of the plaintiff's counsel that, under this statute, they were entitled to call as witnesses any persons who were in the employ of the defendant at the time of the accident, and obtain the benefit of their testimony without being bound by it. They insisted that the witnesses so called were not their witnesses, but the defendant's witnesses, and that any testimony given by them was not a part of the plaintiff's case except in so far as plaintiff wished to make it such. Relying on this theory, they called witnesses Perry, Lawless, Venneman, Bays, Hibner, and Snyder. The title would seem to be enough to show that these were not to be called as defendant's witnesses. They are there referred to as employés or agents of the opposite party and as witnesses called in behalf of the party calling them. The act allows such witnesses to be cross-examined and contradicted by the party calling them. The provision that such calling shall not interfere with their right to contradict or deny the truth of their statements conferred no new right. This act does not give the right to make them the witnesses of the adversary of the party calling them.

We have gone carefully over the record and briefs of counsel, and are constrained to say that defendant has not been shown to be negligent, that plaintiff was negligent in his disobedience of the rules of the road, which was the sole cause of his injury, and, being fully convinced that under no theory can plaintiff ever justly recover damages growing out of this transaction, the judgment is reversed, and a new trial is denied.

STEERE, McALVAY, BROOKE, and STONE, JJ., concurred with OSTRANDER, C. J.

BLAIR, J. (*dissenting*).    In my opinion it was at least a fair question for the jury as to whether it was negligence on the part of defendant for the train dispatcher to send out train No. 8 without giving notice to the yardmaster of his intention to do so; he knowing that the yardmaster, acting upon the information furnished to him "just before No. 8 leaving time or just after," would be likely to use the main tracks as yard tracks so far as No. 8 was concerned.

I am also of the opinion that the judge did not err in submitting to the jury the question of plaintiff's contributory negligence.    The negligence of plaintiff is to be considered with reference to the information, communicated to him through proper channels by the train dispatcher, that No. 8 would detour as it had been detouring for several days.    While the violation of a rule is evidence of negligence, as in the case of the violation of an ordinance, it is not under all circumstances conclusive evidence of negligence.    The train dispatcher controls the movement of trains, and, in my opinion, it should not be held that, as a matter of law, it is negligence *per se* for the employés to rely and act upon his information as to the movement of trains.    Even though it was negligence in the abstract to go upon the south main track, it might not be negligence as to train No. 8, which plaintiff, as a reasoning human being, had a right to believe he need not consider.    *Garrity* v. *Railway Co.*, 112 Mich. 369 (70 N. W. 1018, 37 L. R. A. 529); *Philip* v. *Heraty*, 135 Mich. 446 (97 N. W. 963, 100 N. W. 186); *Cook* v. *Johnston*, 58 Mich. 437 (25 N. W. 388, 55 Am. Rep. 703); *Sterling* v. *City of Detroit*, 134 Mich. 22 (95 N. W. 986); *Tyler* v. *Nelson*, 109 Mich. 37 (66 N. W. 671); *Buxton* v. *Ainsworth*, 138 Mich. 532 (101 N. W. 817).

Counsel for defendant say in their brief, after referring

to the orders given by the yardmaster orally and by telephone, as to movements of trains on the yard side tracks, and occasionally on the yard main tracks:

"There is a wide distinction between the above kind of orders, which are almost always communicated around yards by telephone or word of mouth, and orders allowing an engineer to use a main track on the time of a superior train. Main tracks through yards still retain their character as main tracks, and are under control of the train dispatcher. Yard engines often use these tracks, but, before doing so, they must know that no regular trains are due and no special trains with superior rights through the yards. On these main tracks various classes of trains move and a complicated system of rights has grown up to control their movements. Under this system the only man who can annul a regular train inside Wyoming yards is the dispatcher. As far as an engineer moving on a main track in Wyoming yards is concerned, he is entitled to believe that a regular train is annulled only when he has in his possession a written order from the dispatcher to that effect. No yardmaster or switch tender can annul a regular train in Wyoming yards under the rules, and, under the rules, the dispatcher cannot annul a regular train except by written order. There is absolutely no evidence in this record to show that in Wyoming yards or outside of it any train was ever annulled except by written order sent out by the dispatcher. The failure to appreciate the respective jurisdictions of the yardmaster and of the dispatcher in Wyoming yards, as established by the rules and practices of the defendant, the failure of the court to grasp the idea that the yardmaster controls yard tracks, and to some extent main tracks off the time of regular trains, but that the dispatcher is supreme over regular trains on main tracks, and that nobody is entitled to assume anything as to the movement of one of these regular trains on a main track, unless he had in his possession an order from the dispatcher, was one of the principal causes of the error of the court in this case."

And again:

"Movements on the main line when regular trains are not due may properly be directed and controlled by the yardmaster, for he has the means of knowing all the

trains that are on those tracks at that time. In that case the main tracks are treated for the time being as yard tracks, and all engines move on them under control, looking out for themselves and each other. To give the yardmaster control over such movements is a thing commonly done, and is a very different thing from giving him or any one under him the right to let an engine go out on the main track on the time of a regular train which has the right of way, does not run under control, and over whose movements the yardmaster has no jurisdiction. * * * When regular trains are not due through the yards, the yardmaster has the right to use the main tracks for switching movements, for the purpose of getting trains and cars from one part of the yard to another. The yardmaster has no control over regular trains, and their rights on the main track, when due, are paramount to any rights that he or any one under him can give. * * * On the night of the accident and a short time before No. 8 was due to leave the Union Station, the yardmaster at Wyoming yard called the dispatcher's office on the public telephone, and inquired if it was the intention to detour No. 8 that night in the same way that it had been detoured other nights. He was informed that it was the intention. The yardmaster communicated this information to the switch tenders. This communication was for the purpose of advising them that they could let a south-bound freight train into the yards without incurring a delay for No. 8, as explained above."

Mr. Lawless, the night yardmaster, testified:

"That night I called up the dispatcher's office on the telephone. I asked him how No. 8 was going. Before that I had been outside, and I came into the yard office at Wyoming yards. If I remember right, the clerk had called up the dispatcher before that time, and the clerk told me that No. 8 was going over the G. R. & I. or over some other road. I do not remember which. I then called up the dispatcher's office personally, and a man by the name of Booman, an operator in the dispatcher's office, answered. The operator gave me the information. * * *

"Q. But whatever was the information the operator gave you came from the dispatcher, didn't it?

"A. That is the way I understood it to be. * * * I believed what he said, but, as far as running the train against that other man, I would never have done it.

"*Q.* Didn't you rely upon the statement or information that you had there that No. 8 was going to detour over the G. R. & I. ?

"*A.* I believed it at that time, yes, sir; believed that they were going to detour that certain train.

"*Q.* And you relied upon that, didn't you?

"*A.* In that one certain train of cars; yes, sir.   I think I called up there between 11:25 and 11:30 p. m.   It was either just before No. 8 leaving time or just after.

"*Q.* And, of course, you relied then upon the fact that this particular train No. 8 was going around over the G. R. & I., didn't you?

"*A.* As far as that train of cars is concerned; yes, sir. *   *   *

"*Q.* Suppose you received a message over the wire that No. 8 was going by the way of G. R. & I., would you have a right to rely on the fact that it was going on the G. R. & I.?

"*A.* As far as that train No. 8 would go on there, that particular train of cars was going that way, that would be simply giving me the advice.   That would be no annulment of train No. 8.   *   *   *   At the time I called up the dispatcher's office, I was told that No. 8 was going to detour over the G. R. & I."

The train dispatcher testified:

" Our first instructions were that No. 8 was to go the regular way, and afterwards it was changed to go via the G. R. & I., and then, after that, it was changed back to the original route.

"*Q.* Now, what I want to get at is what did he tell you that he told the night yardmaster, or what did you tell him to tell him at the time he called up?

"*A.* Now, he was in communication with Mr. Quinlan about that and what passed between the operator and I, I could not say, but he kept me posted—

"*Q.* Now, to refresh your recollection, didn't he tell you or you tell him that he had informed the night yard-master that No. 8 was going to detour over the G. R. & I. ?

"*A.* I might have done so; yes.

"*Q.* You said a moment ago that you knew the night yardmaster or somebody there at Wyoming yard called up to find out?

"*A.* Yes, sir.

"*Q.* And that was the answer that you had given, was it, at that time, that No. 8—

"*A.* That was before the change; yes.

"*Q.* Before the change the last time?

"*A.* Yes.

"*Q.* Was that the answer that you had given?

"*A.* Yes, sir.    *   *   *

"*Q.* Have you any way of knowing what time you got the order changing that arrangement of things; that is, about No. 8 not detouring?

"*A.* No.   That was done by telephone with Mr. Quinlan (chief train dispatcher).

"*Q.* And so that the detouring matter, by Mr. Quinlan, was changed again, was it?

"*A.* Yes, sir.

"*Q.* And that was changed by telephone?

"*A.* Yes, sir; with Mr. Quinlan.   *   *   *

"*Q.* Do you know why Mr. Quinlan changed the order there at that time to send the train out over the Pere Marquette?

"*A.* We received word from Mr. Long, I think it was —he was our engineer, civil engineer at that time—that the track, that the bridge would be so that we could go over it by a certain time, and it would be as well to run them that way to save time.

"*Q.* That was just before you sent No. 8 out that night, wasn't it?

"*A.* The last change; yes.

"*Q.* And that was just before No. 8 went out on the night of March 9th that you received those instructions?

"*A.* Yes; this last change.

"*Q.* How did that instruction come?   Did that come by telegraph or telephone?

"*A.* Telephone from Mr. Quinlan.   *   *   *   We did not telephone out there that there had been any change. Mr. Quinlan is our chief dispatcher.

"*Q.* Now, he gave you instructions over the telephone to detour No. 8 over the G. R. & I.?

"*A.* Gave it to our office; yes.

"*Q.* And he also gave you instructions over the telephone to run your train over the Pere Marquette, No. 8?

"*A.* After the first change.

"*Q.* So he was giving you instructions as to what movement of passenger trains by telephone, was he?

"*A.* As to which way to run them; yes, sir."

The switch tender at Sunny Side testified:

"*Q.* I understood you to say you received your orders as to how to handle your switch from the yard office at Wyoming yards?

"*A.* I did.    There was no telegraph office at my station.    I never received any 31 orders or 10 orders.

"*Q.* How did you receive your orders?

"*A.* Over the telephone.

"*Q.* Telephone from Wyoming yards?

"*A.* From Wyoming yards.

"*Q.* Now, the orders given you there at that station, what orders was it that you received there; I mean in regard to handling your switch and trains?

"*A.* In order to running the trains you mean?

"*Q.* Yes.

"*A.* They gave me the orders from there in case any specials or anything of that kind were out, outside of the regular trains, why, they gave me the orders on telephone, or any other order that they wanted me to handle.

"*Q.* You handled them by telephone from the Wyoming yard office?

"*A.* Yes, sir; no other way.

"*Q.* For instance, if with your information that you received you wanted to know whether a regular was late, did you get your instructions from Wyoming yards over the telephone?

"*A.* I did.

"*Q.* And as to whether a train was annulled?

"*A.* Yes, sir.

"*Q.* It came by telephone?

"*A.* Yes, sir.

"*Q.* I will ask whether you made those inquiries, or they were telephoned out to you without inquiry?

"*A.* They were telephoned to me without.

"*Q.* If a regular train then was late, you received that instruction, did you, from the Wyoming yards office?

"*A.* Yes, sir.

"*Q.* Or, if it was annulled, you received that instruction from the Wyoming yard office?

"*A.* I did.    *    *    *

"*Q.* As to your authority there at your station, what instructions did you receive as to letting trains through?

"*A.* Why, of course, outside of the regular train, I was instructed to use my own judgment in letting them through.

"*Q*. In letting them through?

"*A*. Yes, sir.

"*Q*. Suppose, for instance, that you received an order that a train was an hour late, and an extra should approach your station from the east, would you let it through?

"*A*. I would; that is, up to a certain time of this hour.

"*Q*. That is up to the time of—

"*A*. Say 10 or 15 minutes.

"*Q*. Were those your instructions to let them through?

"*A*. They was.

"*Q*. So, if a train was annulled, was it your instructions to let the trains through then?

"*A*. It was. * * * The first day that they were detoured was the 6th of March, and they were detoured every day after that until the 9th. On the 6th I received my instructions that trains were going to detour over the G. R. & I. over the telephone from the yard.

"*Q*. Then did you act accordingly?

"*A*. I did.

"*Q*. Paid no further attention to the train?

"*A*. No, sir.

"*Q*. Did you receive each day after that a telephone order up to the 9th that they were going to detour the G. R. & I. tracks; that is, the regular train.

"*A*. No; not each night I didn't.

"*Q*. How did you know that they were going to detour there?

"*A*. I didn't know, only I depended on the yardmaster to let me know.

"*Q*. I know, but did the yardmaster let you know?

"*A*. When they gave me this telephone, they gave me that telephone as an order until further orders, you see.

"*Q*. Oh, until further orders?

"*A*. Yes, sir. I received a telephone message on the night that plaintiff was injured. Plaintiff arrived there from the east with his train at 11:35 p. m.

"*Q*. Did you handle the trains that came through there, let them in or stop them, according to the message that you received over the telephone from the yard office?

"*A*. I did. Mr. Jones arrived there about 20 minutes after I had received that information.

"*Q*. Do you remember how it was; did you make inquiry yourself, or were you told?

"*A*. They called me up and told me.

"*Q.* Would they call you up on the same phone they called you, would they notify the Plaster Creek office, too?

"*A.* Any time like that they called us both, first one and then the other, so both switch tenders heard it together, so we understood it.

"*Q.* After receiving these orders, you did go on and handle the trains accordingly?

"*A.* Yes, sir.

"*Q.* As I understood you to say, that was your instructions to do so from the yardmaster?

"*A.* It was.   It was Lawless gave me that instruction over the phone about 11:20 p. m.

"*Q.* Between the time that Mr. Lawless had informed you that No. 8 was going to detour over the G. R. & I., did you get any other order from the office that No. 8 was coming that way?

"*A.* I did not.

"*Q.* Would you be notified if a special was going to run, and would they give you the time of its running past your station?

"*A.* Yes, sir.   If the order was canceled, they would notify me of that fact through the yard office by telephone.

"*Q.* And, as I understand you, it was your orders to act accordingly with the switches after receiving such an order?

"*A.* Yes, sir.

"*Q.* Now, did you have any instructions as to the time, after letting one train through, that you would let another through the switch following it?

"*A.* Yes, sir.   I was not to let another train follow a regular within 10 minutes, but all extras or like that it didn't make any difference.   *   *   *

"*Q.* When Mr. Jones arrived there at Sunny Side, what information did you give him, or what conversation did you have with him?

"*A.* I told him that I had order that No. 8 was going to detour over the G. R. & I.   I told him to go ahead and gave him the switch.   It was 11:35 p. m. when he passed through my switch to the south.   *   *   *   If No. 8 had been on time, she would have been due at my station about 11:32 p. m.   That would be three minutes before Mr. Jones appeared there.

"*Q.* Would you have let Mr. Jones through there over that track, had you known they were going to send No. 8 down?

"*A.* No, sir. I relied upon the instructions that they gave me that No. 8 was going to detour.

"*Q.* And, had you had any knowledge whatever that the dispatcher had changed his mind about that train, would you have let Jones through?

"*A.* No; I would not.

"*Q.* Did you know what train that was that was running; that is, No. 8 train that came down there, did you know what it was when it approached you?

"*A.* I did not.

"*Q.* Did you know what it was when it got through and past?

"*A.* I did not."

Charles Williams testified:

"*Q.* Now, Mr. Williams, you have not read any order concerning any detouring of any train on the 6th, 7th, 8th, or 9th. I will ask you if orders for detouring are made by the dispatcher of trains?

"*A.* Not for detouring; no.

"*Q.* I will ask you if detouring a train over the G. R. & I. annuls the train?

"*A.* No, sir.  *  *  *

"*Q.* Suppose a railroad man were told that No. 8 was going over the G. R. & I., would that mean to a railroad man, under the rules, that there would be no train go over the Pere Marquette on the time of No. 8?

"*A.* Not necessarily; no, sir. As long as the schedule of No. 8 was not filled, they might run trains over their own tracks on the time of No. 8.

"*Q.* Suppose they should issue an order annulling No. 8, then that would be different, would it?

"*A.* That is a different thing entirely; yes, sir."

Plaintiff testified:

" I arrived at Sunny Side at 11:35. There was regular passenger train called No. 8 that was due to leave the Union Depot for Chicago at 11:30 p. m. A regular train is a train that runs on a schedule, on a time card.

"*Q.* And you say you arrived at Sunny Side at 11:35, five minutes afterwards?

"*A.* Yes, sir.  *  *  *

"*Q.* When you arrived at Sunny Side, what did you do?

"*A.* I pulled down clear on the Y, clear of the Chicago

Division, so that I was clear off and took the brakeman's lantern, and went down myself, personally, and asked the switch tender, Mr. Perry, how No. 8 was, and he says, 'Highball.' He says: 'No. 8 is going to detour over G. R. & I. Go ahead, the track is all your own.' * * *

"*Q.* Well, now after he had instructed you to go ahead, the track was yours, what did you do then?

"*A.* I went back to my engine and proceeded on to Wyoming yards, and, on approaching Plaster Creek, I called for that crossing there to get into the yard, and they would not give it to me. I called for the crossing with three whistles. That was the call that would let me into the north lead of Plaster Creek. They would not give me the crossing there to go into the yards. The switch tender gave me a motion with his lantern to go ahead, and I pulled down to the switch tender's station, and had a conversation with him. He said: 'Pull down to the south end of the yard and back in. The yard is blocked.'

"*Q.* That is, the lead was blocked?

"*A.* The north into the yard were blocked.

"*Q.* Then you understood the lead was clear, but the switches blocked?

"*A.* Yes, sir.

"*Q.* Then what?

"*A.* I pulled down to the south end of the yard over the south lead switch, and they throwed or turned the switch for me to turn my train in.

"*Q.* Do you know who did that? .

"*A.* The brakeman, I think.

"*Q.* Now at that point, did you back your train there?

"*A.* Yes, sir.

"*Q.* At that point did you have any conversation with any one?

"*A.* Yes, sir.

"*Q.* Who was it?

"*A.* Dan Lawless, the yardmaster.

"*Q.* What was the conversation you had with him?

"*A.* He stood at the switch when the engine went by the switch, and I hollered to him, and asked him what the other lead was.

"*Q.* What do you mean by lead?

"*A.* I was on one lead, and there was another lead running in, running parallel with the lead I was already on.

"*Q.* What did he say?

"*A.* He said: 'You had better come down the main.' He said: 'If you come down that lead, you will have lots of switches to throw, and it will be blocked with cars.'"

Defendant's traveling engineer testified:

"*Q.* Now, then, if the yardmaster had conveyed this notice to the Sunny Side switch tender that No. 8 was going to detour over the G. R. & I., did he have any right to rely upon that notice?

"*A.* He had the yardmaster's word that it was going to detour, and I suppose should rely upon it.

"*Q.* And in fact he should, shouldn't he?

"*A.* Yes, sir."

The train dispatcher was invested with the entire power of the company in moving trains, and it is a fair inference from the testimony that the train dispatcher understood that the yardmaster was making inquiries as to train No. 8 for the purpose of ascertaining whether he might use the main tracks through the yard without reference to that train. These inquiries were made just before or just after the leaving time of train No. 8, and the care of the yardmaster and the importance he attached to the information requested is shown by the fact that he did not rest upon the statement of his clerk, but called up the train dispatcher himself. When the train dispatcher informed him that train No. 8 would not come through the yard at all but would detour over the Grand Rapids & Indiana, he had a right to rely upon this statement and did rely upon it, and communicated the information in the customary manner to the switch tenders, and the switch tenders acted upon this information communicated in the customary manner, as was their duty. And the plaintiff, when informed by the yardmaster, through the switch tender, that the train would not pass through the yards that night, had a right to rely upon such information.

The question is not whether the trainmaster's information was given in a particular form, but Was it such as a reasonably prudent man might rely upon as stating a fact? The train dispatcher himself acted upon a tele-

phonic communication from the chief train dispatcher, and he manifestly expected that the yardmaster should act upon the telephone message from him. According to the testimony of the train dispatcher, no formal orders were made for the detouring of trains; and neither were there any formal orders as to the lateness of trains, but, as appears from the testimony hereinbefore quoted, such information was communicated customarily over the telephone, and was manifestly so communicated, with the expectation that it would be acted upon as true. It is not a sufficient answer to say that the train dispatcher had a right to rely upon an observance of the rules by the trainmen so far as train No. 8 was concerned. He had expressly notified them that they might disregard that train, and could not have relied upon their observance of any rules to protect themselves against that train. He must be held to have known that the men would rely upon a statement coming from him, the supreme power in the movement of trains, that train No. 8 would not go through the yard that night, but would detour just as it had been doing for several days. The negligence of the plaintiff, in my opinion, should be determined with reference to the situation which confronted him, and not merely with reference to arbitrary rules. So considered, his contributory negligence was at least a question for the jury. The whole question, in my view, is whether the plaintiff had a right to rely upon the information given him in the customary way; and, if he did, then he was under no obligation to protect himself against train No. 8 at all. The record fairly discloses, I think, that the plaintiff had a right to rely upon the information given him as to train No. 8, or, at least, that it was not negligence *per se* to rely upon it.

It is said, however, that, since train No. 8 was not formally annulled, other trains might be sent through the yard on No. 8's time, and that plaintiff was chargeable with notice that he might meet an extra at any moment, and therefore was guilty of negligence in using the south-

bound main track in backing north. Assuming that it would be negligence in the abstract for the plaintiff to back north upon the south-bound main, and that plaintiff would have been guilty as a matter of law of contributory negligence in case of collision with any other train running on No. 8's time, it does not necessarily follow that he was guilty of contributory negligence in this case. If, so far as the train which collided with his engine was concerned, it was not actual negligence for him to use the particular track, his cause of action was not lost because of hypothetical occurrences which might have convicted him of negligence.

The trial court, however, did not take this view, but adopted the defendant's view, and instructed the jury that plaintiff was guilty of contributory negligence, unless observance of the bulletin had been waived by the defendant, which question he submitted to the jury. In my opinion the testimony in the case, and particularly that given by plaintiff, Albert Palmer, and John Bays, warranted the court in submitting to the jury the question of the abrogation of the bulletin as to the track to be used under such circumstances as existed in this case. I think the court sufficiently corrected such errors as were committed in receiving opinion evidence as to the construction of rules and bulletins, so that there was no prejudicial error.

No request for a ruling appears to have been insisted upon as to the improper argument of counsel, and such argument is not, therefore, properly before us for consideration.

In my opinion the judgment should be affirmed.

MOORE, J., concurred with BLAIR, J.

BIRD, J., did not sit.