JOHNSON v. UNION CARBIDE CO.

1. APPEAL AND ERROR—TRIAL—DIRECTED VERDICT.
   On error to a verdict and judgment directed for defendant, plaintiff is entitled to have the evidence considered in the light most favorable to him, leaving out of consideration testimony contradicting it offered by defendant.

2. MASTER AND SERVANT — CONTRIBUTORY NEGLIGENCE — TRIAL — DIRECTED VERDICT.
   Although plaintiff testified that in putting his arm among running machinery he did not observe whether or not the belts upon it were running, and did not look to see, but trusted the employé with whom he was working, it was error to direct a verdict for defendant on the ground of contributory negligence, where he afterwards stated that he looked at it, and

so far as he could see in the dim light which he had, the belt which caught his arm was not moving.

3. SAME—STATUTES—MACHINERY—GUARDS.
   Under Act No. 113, Pub. Acts 1901, plaintiff did not assume the risk of defendant's failure to guard belts and pulleys.

4. EVIDENCE—CROSS-EXAMINATION—WITNESSES—STATUTES.
   A witness in the employ of defendant, called by plaintiff for cross-examination under Act No. 307, Pub. Acts 1909, could properly be asked leading questions and cross-examined by counsel for defendant.

5. SAME—CONCLUSION.
   A witness for defendant, who was asked if plaintiff had ever stopped the machinery on which he was engaged at the time of his injury, who stated that he could not remember any particular instance but was positive from work that plaintiff had been doing that he had stopped it, was improperly permitted to testify to his conclusion.

6. SAME—STENOGRAPHIC MINUTES—IDENTIFICATION.
   The official stenographer, who took the minutes of testimony given on a previous trial and identified a typewritten copy as the testimony given, was rightly permitted to give evidence as to the contents although he had no recollection of the testimony.

Error to Chippewa; Steere, J. Submitted November 29, 1910. (Docket No. 124.) Decided May 3, 1912.

Case by Joseph T. Johnson against the Union Carbide Company for personal injuries. A judgment for defendant on a verdict directed by the court is reviewed by plaintiff on writ of error. Reversed.

*John W. Shine*, for appellant.

*Fred L. Vandeveer* (*Warner & Sullivan*, of counsel), for appellee.

McALVAY, J. Plaintiff was injured while employed in defendant's carbide factory. He brought suit to recover for such injuries, claimed by him to have been caused by the negligence of defendant. The trial resulted in a ver-

dict against him directed by the trial court on account of his contributory negligence. This court is asked by plaintiff to reverse this judgment.

In considering the case of plaintiff as presented by the record, the well-known rule that it will be considered most favorably to him will be applied, and in the statement of facts defendant's case will not be considered.

The accident occurred in defendant's carbide factory, where plaintiff, who had been injured some time before by an explosion, was employed in doing light work, sweeping the floors, filling carbide cans, and oiling machinery, as directed from time to time. He had been an oiler about two weeks before the injury. He was hurt by having his arm drawn in between the belt and pulley on the end of the stack of rollers called No. 1, being one of five such sets or stacks of rollers used for grinding carbide in the large grinding and packing room on the ground floor in the factory. This department is filled with machinery. These rollers consist of three pairs each, and are inclosed in iron casings 6 or 8 feet square and 10 to 12 feet high. These rollers crush the carbide which is admitted at the top and passes down between them and out at the base. The roller shafts upon which they revolve extend through the casings on the front two feet, and upon the outer end of each is a 10-inch pulley with a 12-inch face upon which runs a 12-inch belt which drives the rollers. The bottom of the lower pair of pulleys is 25 inches from the floor. The drive belt comes from under the left side of a 16-inch pulley, which is 2 feet below the right-hand pulley of the lower pair of pulleys on No. 1, running up over the top of that right-hand pulley and down under the left-hand pulley of this pair, and then directly up to the left face of the left-hand pulley of the second pair, then over it down under and up around the right-hand face of its mate, and so on to the third pair.

This belt, when power is applied, moves in the direction described and indicated up over and around these pulleys,

and by this arrangement the rollers of each pair turn towards each other in grinding the carbide.

When plaintiff was put at work oiling, he objected because he was not acquainted with machinery. The boxes in which the roller shafts rest and revolve are bolted to the iron framework of the roller casing back of the pulleys in such a manner that the rollers may be adjusted to grind coarse or fine. These boxes from vibration and other causes at times become loose and require adjustment. Between the boxes of the two lower rollers was placed a piece of iron with a hole and thread into which was screwed a set screw. The piece of iron pressing against the inner end of one of these boxes and the head of the set screw presses against the inner end of the other. The distance between the faces of these pulleys on the ends of the roller shafts was 2⅛ inches, and between the inner ends of the shaft boxes was about 2 inches. Between the face of the casing and the inner edge of the pulleys the distance was 12 inches.

Plaintiff was not acquainted with machinery. When he was changed from sweeping to work as an oiler, he objected for that reason, and was told by the superintendent that it would be but a few days until he could get an experienced man. On the day of the injury these lower rollers in No. 1 required adjustment. They were grinding too coarse. The superintendent was absent, and the

man who was always in charge in his absence called to
plaintiff, and ordered him to help him adjust these rollers.
It was about four o'clock in the afternoon of February 25,
1908.  The light was very dim and the air was full of
dust.  Objects could not be discerned clearly.  The man
in charge, when plaintiff came to him, had an electric
light in his hand, the only light in that part of the room
at the time.  He handed the plaintiff a wrench, and
ordered him to turn the set screw, and said he would hold
the light for him.  He stepped behind the belt on the out-
side of the left-hand pulley and reached in with the light
so that plaintiff could see the set screw and block.  Plain-
tiff had never done this work before, and was not warned
of the danger, or instructed how to do it.  As the light
was held he could not see clearly the pulleys or belt.
Plaintiff stood in front of the pulleys, reached over, and
put the wrench on the set screw, and Owen, holding the
light, told him to give it a quarter turn towards him.  He
did this easily, and was told to give it another turn.  He
undertook to do this, and found that it required the use
of more force, and pulling hard the wrench slipped, and
his left arm was caught by the belt and drawn under the
left-hand pulley, and so injured as to require amputation
at the shoulder.  These pulleys were not guarded in any
manner.

Plaintiff testified that he thought there was no danger,
and trusted Owen, who knew about it, not to put him in
danger.  The running machinery on this floor made a
great noise.  Plaintiff had been working about this factory
about two years, but not in connection with the machin-
ery until he was put at work oiling about two weeks be-
fore he was injured.  It is undisputed that this machine
had never been adjusted before without stopping it.  The
superintendent only could authorize stopping it.  Plain-
tiff had never stopped it, and did not know how to do so.
Plaintiff charged defendant was guilty of negligence in
putting him at work on dangerous unguarded machinery

without warning or instructing him as to such dangers, in a dim light with a defective tool.

Upon the question of the unguarded belt and pulleys, the facts are not disputed, and the record shows that this belt was not properly safeguarded as required by statute. It was recognized by the trial court that plaintiff, but for what the court held to be his contributory negligence, made a case for the jury. The jury was charged:

"Even conceding the contention which is made in his behalf that he is relieved of the assumption of risk by the failure of defendant to observe a statutory duty, and conceding that there was negligence on the part of defendant in the other respects complained of, we still are confronted in this case with the legal question of contributory negligence and with the rule, as applied to that, which holds specifically and beyond any question that he cannot recover unless on his part he has exercised due care reasonably commensurate with the obvious danger to avoid any injury."

He further stated that it appeared plaintiff was of mature years, of sound mind and good eyesight, that he was very familiar with the factory and the machinery, and presumably with its plain and obvious dangers. In effect, that he was a normal individual, with eyes and intelligence which he did not use, and determined, as a matter of law, that upon his own testimony he had contributed to his injury, and therefore could not recover.

The testimony of the plaintiff, upon which the court relied in directing a verdict by reason of contributory negligence, is as follows:

"I didn't take notice whether the pulleys were running or whether the belt was running. I didn't look at it closely, and I didn't know as a matter of fact whether it was running or not. * * * I didn't notice the belt when I went in there. I didn't notice it. * * * I knew the machinery was running after I was caught. I didn't know before I was caught.

"Q. Did you walk up there and put your arm over these pulleys without ever noticing whether the machinery was running or whether it was standing still?

"A. Yes, sir.

"*Q.* And without ever looking to see whether there was any danger of getting caught or not ?

"*A.* I didn't think there was any danger.

"*Q.* Well, you told me you didn't look to see whether the machinery was running or not ?

"*A.* No, sir.

"*Q.* What made you think there was no danger ?

"*A.* I thought he wouldn't put me there if there was any danger.

"*Q.* And you were trusting to Owen entirely, were you ?

"*A.* Well, yes; he knew something about it, and I didn't."

In another place his testimony is:

"*Q.* Did you give your own safety any thought at the time you went up there to turn the set screw ?

"*A.* I didn't think of anything, only of doing the work he told me to do."

The question is repeated.

"*A.* No.

"*Q.* If you had stopped to think about it, you knew it was dangerous, didn't you ?

"*A.* Well, if I had understood it, I would, probably."

The question is repeated.

"*A.* No. * * * I oiled that machine when it was standing still. I didn't know the way to stop it at the time. I couldn't tell you for that at all whether I knew the belt was running. I knew the machinery did run sometimes. I didn't know it might be running at that time. It looked like as if it was standing still. Why, you couldn't help looking at it when you came right up to it. It looked as though it was standing still under the shade of the light. That is all I could see in there. The light was behind the belt when he went in there. I looked at it when I got right up to it. I didn't look at it closely, but as he pointed it out to me. * * * I don't think the set screw revolved with the machinery. No, it didn't. When I looked over there I couldn't see nothing moving. Everything seemed to be still, from the light that he had there."

In this connection it is well to call attention to some

other parts of his testimony: He says it was growing dusk. The light was poor; the only light there being the one held by Owen. There was a great noise from the various machines.

" When Mr. Owen was holding the light inside there, it was shaded in there so I could not see clearly these pulleys or belt. * * * It looked as though it was standing still under the shade of the light. That is all I could see there. * * * There was not sufficient light for me to observe whether belts were running or wheels in motion."

From an examination of all his testimony and a consideration of all the facts, circumstances, and conditions appearing in the record, to all of which we must give the most favorable construction for the plaintiff, we cannot agree with the trial court in holding as a matter of law that plaintiff was guilty of contributory negligence. The court evidently construed his testimony quoted as showing no care for his safety. A careful reading of it shows that he denies he stated he did not look to see whether this machinery was running, and it will warrant the construction that because of the want of light he did not see that it was running. Our opinion is that the question of his contributory negligence was one of fact to be submitted to the jury under proper instructions.

The court was in error in instructing a verdict for defendant.

For the reason that a new trial must be had, other questions must be discussed. From the record as presented it appears uncontradicted that defendant had violated a statutory duty in not properly safeguarding this belt. The requirement is:

"All gearing or belting shall be provided with proper safeguards." Section 8, Act No. 113, Pub. Acts 1901.

Plaintiff did not assume the risk attendant upon the absence of the guard. *Swick* v. *Cement Co.*, 147 Mich. 454 (111 N. W. 110).

Failure to provide safeguards is evidence of negligence.

*Sipes* v. *Starch Co.,* 137 Mich. 258 (100 N. W. 447);
*Little* v. *Bousfield & Co.,* 154 Mich. 369 (117 N. W. 903);
*Van Doorn* v. *Heap,* 160 Mich. 199 (125 N. W. 11), and
cases cited.

Plaintiff assigns error because the court permitted a
witness in the employ of defendant, claimed to be called
by plaintiff for cross-examination, under Act No. 307,
Pub. Acts 1909, to be cross-examined and asked leading
questions by counsel for defendant. This act is entitled:

"An act to authorize parties litigant when they call as
witnesses in their behalf the opposite party, employé or
agent of said party, to cross-examine such witnesses, and
providing that they shall not be bound by their answers."

In a recent case this statute has been before the court
for construction, where it was pointed out that, except
provision was made that the party calling such witnesses
should not be bound by, and might contradict, their testi-
mony, no other right was conferred making them the wit-
nesses of the opposite party. *Jones* v. *Railroad Co.,*
168 Mich. 1 (133 N. W. 993). No error was committed
in allowing this cross-examination complained of.

Error is assigned upon the refusal of the court to strike
out certain testimony of the foreman of this department
of defendant's plant; it being claimed that such testimony
was a conclusion of the witness, who testified as follows:

"I can't remember any particular instance that John-
son ever stopped No. 1 roll; but I am positive that he
has.

"*Q.* What makes you positive that he has?

"*A.* Well, he was doing that work around there for
quite a while, and he would have to do it."

It will be remembered that plaintiff has worked but
two weeks oiling machinery; that this machine had never
before been adjusted without stopping it. The record
shows that he helped change the rolls in it on Sundays,
when the machine was not running. This superintend-
ent's testimony is that he had no recollection of having
seen the plaintiff stop the machine, but was positive that

he had stopped it, because of the work he did around there. This testimony was upon a very material matter, and was certainly a conclusion of the witness, and should' have been stricken out.

The last question relates to the testimony of the court stenographer, relative to the testimony of plaintiff taken upon a former trial, used for the purpose of impeachment. On cross-examination of the plaintiff, certain questions were asked relative to testimony given by him upon a former trial, for the purpose of laying a foundation for impeachment. This official stenographer was called by the defense to prove such testimony. He testified that he took the stenographic notes of the testimony of plaintiff correctly and had written a transcript of it, and identified the typewritten copy as being the testimony given at that time. Counsel for defendant then proceeded to examine the witness in the usual manner as to the testimony given by plaintiff on a former trial. It appeared that the stenographer, on being interrogated by counsel, did not have a recollection of all that was testified to by plaintiff. He said:

" I know it was said without remembering. I took it down and wrote it out, and I. can identify page by page this typewritten testimony as being testimony given at that time."

It was objected that he was not testifying from his recollection of what the witness said. The objection was overruled and the testimony was admitted.

This court, in a recent case where the question of the admissibility in evidence of memoranda made by a witness at the time of the happening of the event under inquiry, held that upon reason and authority such a memorandum would be competent evidence of the facts therein recorded, if its verity as a record of fact is sufficiently established. *Koehler* v. *Abey*, 168 Mich. 113 (133 N. W. 923), and cases cited. In the instant case the verity of the stenographer's notes was not questioned. They were therefore admissible in evidence. See, also, 26 Am.

& Eng. Enc. Law (2d Ed.), p. 783, and cases cited. No error was committed in receiving this testimony.

For the reasons stated, the judgment is reversed, and a new trial granted.

MOORE, C. J., and BLAIR, STONE, and OSTRANDER, JJ., concurred.