FERGUSON v GONYAW

1. WITNESSES—ADVERSE PARTY—STATUTES.

The adverse party witness statute permits a calling party to treat
an adverse party as if he had been called to testify on his own
behalf; the witness may be asked questions as if on cross-
examination, and he may be impeached by the calling party
(MCLA 600.2161).

2. WITNESSES—ADVERSE PARTY—ANNOUNCEMENT RULE—STATUTES.

A party calling an adverse party as a witness under the adverse
party witness statute must announce that the witness is being
called in reliance upon the statute (MCLA 600.2161).

3. WITNESSES—ADVERSE PARTY—ANNOUNCEMENT RULE—PRELIMI-
NARY QUESTIONS.

An announcement that a party calls an adverse party as a
witness in reliance upon the adverse party witness statute is
timely even though the announcement is made after the calling
counsel has begun to question the adverse party witness where
the questions relate solely to preliminary matters; however,
questions concerning a doctor's qualifications were not prelimi-
nary where the questions went to the heart of the issues in a
medical malpractice suit, and the calling counsel was foreclosed
from questioning under the adverse party witness statute
where he failed to announce his reliance upon the statute
before asking the doctor questions regarding his qualifications.

4. WITNESSES—ADVERSE PARTY—ANNOUNCEMENT RULE—LATE AN-
NOUNCEMENT—HARMLESS ERROR.

Permitting a late announcement by the calling party that an

REFERENCES FOR POINTS IN HEADNOTES

[1-4] 58 Am Jur, Witnesses §§ 796, 797.

[5] 5 Am Jur 2d, Appeal and Error § 795.

[6, 8, 11, 13] 61 Am Jur 2d, Physicians and Surgeons § 110 *et seq.*

[7] 20 Am Jur 2d, Courts § 231 *et seq.*

[9, 10] 61 Am Jur 2d, Physicians and Surgeons §§ 205–207.

[12] 30 Am Jur 2d, Evidence § 1086; 75 Am Jur 2d, Trial § 489.

[14] 40 Am Jur 2d, Hospitals and Asylums §§ 8–11.

Exclusion of or discrimination against physician or surgeon by
hospital authorities. 24 ALR2d 850.

adverse party was being called as a witness under the adverse party witness statute was not reversible error where no prejudice to the adverse party was shown and the testimony had only aided the adverse party.

5. APPEAL AND ERROR—HARMLESS ERROR.

The Court of Appeals is not required to determine if an error is harmless where there is no error.

6. PHYSICIANS AND SURGEONS—OSTEOPATHIC DOCTORS—MEDICAL DOCTORS—MALPRACTICE—STANDARD OF CARE—SPECIALISTS.

Medical specialists should be held to a national standard of care according to their school of medicine; osteopathic and medical schools of medicine have their own standards and practices and should not be compared.

7. COURTS—SUPREME COURT—COURT OF APPEALS—CASE PRECEDENT.

It is for the Supreme Court and not the Court of Appeals to change the law of the State of Michigan; the Court of Appeals is without authority to overrule decisions of the Supreme Court.

8. PHYSICIANS AND SURGEONS—OSTEOPATHS—PATIENTS—STANDARD OF CARE.

A patient who seeks treatment from an osteopath for the cure or alleviation of his condition is charged with knowledge of the fact that the osteopath would follow the methods and practices observed in the osteopathic system of treatment, and is not in a position to complain that the methods and standards of practice customarily observed by another school of medicine were not followed.

9. WITNESSES—EXPERT WITNESSES—PHYSICIANS AND SURGEONS—SCHOOLS OF MEDICINE—MALPRACTICE.

A member of one school of medicine is permitted to be an expert witness at a malpractice trial of a member of another school of medicine; however, a witness who is a member of one school of medicine is not permitted to comment on the training received by members of the other school of medicine.

10. WITNESSES—EXPERT WITNESSES—PHYSICIANS AND SURGEONS—MEDICAL DOCTORS—OSTEOPATHIC DOCTORS.

Prohibiting a medical doctor witness from commenting on the osteopathic standard of care or comparing a medical doctor's and an osteopathic physician's training was not erroneous in a suit for malpractice against an osteopathic physician.

11. NEGLIGENCE—MALPRACTICE—INSTRUCTIONS TO JURY—STANDARDS
    OF CARE.

    Instructing the jury that it was to apply an osteopathic neurosur-
    geon's standard of care rather than simply a neurosurgeon's
    standard of care in a malpractice suit against an osteopathic
    physician was not error.

12. APPEAL AND ERROR—DIRECTED VERDICT—EVIDENCE.

    The Court of Appeals views the facts in the light most favorable
    to the nonmoving party when reviewing a motion for a directed
    verdict.

13. HOSPITALS—NEGLIGENCE—PHYSICIANS AND SURGEONS—OSTEO-
    PATHIC PHYSICIANS—CREDENTIALS—STAFF PRIVILEGES.

    A hospital did not act as a reasonably prudent hospital in
    checking an osteopathic physician's qualifications to be a staff
    member at the hospital where the hospital did not verify the
    facts in the doctor's application for staff privileges, did not
    follow valid guidelines of the American Osteopathic Association
    for checking a doctor's credentials, and did not follow the
    hospital's own normal procedures for checking credentials; a
    hospital should screen its staff of physicians to insure that only
    competent physicians are allowed to practice in the hospital.

14. NEGLIGENCE—HOSPITALS—PHYSICIANS AND SURGEONS—STAFF
    PRIVILEGES.

    A hospital cannot be held liable for negligently allowing an
    unqualified doctor to practice in the hospital unless it is shown
    that even if the hospital's administration had made the recom-
    mended and acknowledged checks on the doctor's qualifications
    they would have denied him staff privileges at the hospital.

Appeal from Wayne, Elza H. Papp, J. Submitted
June 10, 1975, at Detroit. (Docket No. 18982.)
Decided October 13, 1975. Leave to appeal denied,
396 Mich —.

Complaint by James R. Ferguson against Dr.
Earl Gonyaw, an osteopathic physician, and Glen-
dale Neurological Associates, P. C., for damages
arising from medical malpractice and against Mar-
tin Place Hospital for damages caused by its negli-
gence in allowing Dr. Gonyaw to be a member of

its hospital staff. Judgments for defendants. Plaintiff appeals. Affirmed.

*Charfoos & Charfoos, P. C.,* for plaintiff.

*Dice, Sweeney & Sullivan, P. C.,* for defendant Gonyaw.

*Plunkett, Cooney, Rutt, Watters, Stanczyk & Pederson* (by *Jeanette A. Paskin),* for defendant Martin Place Hospital.

Before: Bronson, P. J., and V. J. Brennan and D. E. Holbrook, Jr., JJ.

D. E. Holbrook, Jr., J. Plaintiff filed a medical malpractice action against Dr. Earl Gonyaw, an osteopathic physician, and a negligence action against Martin Place Hospital. The suits alleged that Dr. Gonyaw failed to use a requisite standard of care in treating the plaintiff's back injury and that the hospital was negligent in allowing Dr. Gonyaw to be a staff member at the hospital. At the close of plaintiff's proof, following a seven-day trial, the trial court granted the hospital's motion for a directed verdict of no cause of action. After deliberating, the jury returned a verdict of no cause of action in favor of Dr. Gonyaw. From the judgments entered on these two verdicts, plaintiff appeals as of right.

I

Plaintiff, on appeal, claims that the trial court improperly limited his examination of Dr. Gonyaw. He further claims that the trial court erred in not allowing him to make a separate record of what he would prove if he were allowed a "full"

examination of Dr. Gonyaw. Such a record is necessary for this court to determine if there was any prejudice caused by the trial court limiting the plaintiff's examination of Dr. Gonyaw. *Ruhala v Roby,* 379 Mich 102, 117; 150 NW2d 146 (1967), *cf. Moynes v Applebaum,* 218 Mich 198, 202; 187 NW 241 (1922).

As his first witness plaintiff sought to call Dr. Gonyaw under the adverse party witness statute.[1] MCLA 600.2161; MSA 27A.2161. This statute permits the calling party to treat an adverse party as if he had been called to testify on his own behalf. He may be asked questions as if on cross-examination, but more importantly he may be impeached. Without the aid of this statute it becomes impractical to call the opposing party since the calling party would be bound by his answers. 3A Wigmore, Evidence (Chadbourn rev), § 916. See McCormick, Evidence (2d ed), § 38, p 77.

The purpose of the rule is to allow the truth to be brought out with greater regularity by eliminating a technical rule of evidence. *Detroit v Porath,* 271 Mich 42, 75; 260 NW 114 (1935), *Waller v Sloan,* 225 Mich 600, 603–605; 196 NW 347 (1923), *Giacobazzi v Fetzer,* 6 Mich App 308, 313; 149 NW2d 222 (1967), *lv den* 379 Mich 770 (1967). By allowing the calling party to initially "cross-examine" the opposing party, all the facts can be more readily revealed. With impeachment the calling party has a ready tool to prevent and expose any twisting of the facts by the adverse

---

[1] MCLA 600.2161; MSA 27A.2161, provides in relevant part:

"In any suit or proceeding in any court in this state, either party, if he shall call as a witness in his behalf, the opposite party, * * * shall have the right to cross-examine such witness the same as if he were called by the opposite party; and the answers of such witness shall not interfere with the right of such party to introduce evidence upon any issue involved in such suit or proceeding, and the party so calling and examining such witness shall not be bound to accept such answers as true."

party through the introduction of prior inconsistent statements, for example. The argument that allowing impeachment will coerce the witness into giving favorable testimony to the calling party does not apply when the adverse party is the witness since his interests directly contradict the calling party's. 3A Wigmore, Evidence, *supra,* 4 Jones, Evidence (6th ed), § 26.13.

Although Dr. Gonyaw is clearly an adverse party, who may be called under the statute, when he was called plaintiff's counsel failed to announce that he was being called under the statute. *Ruhala v Roby, supra,* at 111, *Mally v Excelsior Wrapper Co,* 181 Mich 568, 574–575; 148 NW 443 (1914). The purpose behind the rule requiring the announcement of the reliance upon the statute is to give the trial court and the adverse party's counsel warning as to the mode of questioning. This will prevent unnecessary objections by the adverse party's counsel, which can only create the suspicion in the jurors' minds that the witness is attempting to hide something.

Because the announcement rule runs counter to the principle of the adverse party witness statute the Supreme Court carved out an exception in *Walter v Detroit, J & C R Co,* 191 Mich 181; 157 NW 414 (1916). In that case they ruled that the announcement was timely even though counsel had begun to question the adverse party witness since the questions related solely to preliminary matters. In the present case plaintiff's counsel began his questioning of Dr. Gonyaw under the statute without making any announcement about the statute. The first few questions were the normal qualifying questions and then the plaintiff's counsel began to question the doctor about his qualifications. Shortly thereafter, during a confer-

ence in chambers, Dr. Gonyaw's counsel objected to this form of questioning stating that no announcement had been made as required. After hearing extensive argument the trial court ruled that the questions concerning the doctor's qualifications were not preliminary and thus plaintiff's counsel was foreclosed from questioning under the statute for failing to make his announcement.

In reaching its decision, the record indicates that the trial court gave careful consideration to the questions asked by plaintiff's counsel and the genuine issues in the case. The questions went to Dr. Gonyaw's training. One of the central issues in the case was whether Dr. Gonyaw was qualified to practice neurosurgery. Although educational qualifications are normally merely preliminary questions of a medical witness, in this case they go to the very heart of the case. We find that the trial court correctly ruled that the questions did not fall within the category of preliminary questions.

The Supreme Court has also created another exception to the announcement rule to lessen the harshness of the rule. In *Moynes v Applebaum, supra,* the Court stated that it was not reversible error to permit a late announcement under the adverse party witness statute when no prejudice to the opposing party was shown. By holding that it was not reversible error, the Supreme Court implied that it was error to allow the late announcement. However, in reviewing the facts of that particular case, it found the error harmless since the testimony had only aided the opposing party. In the present case by sustaining the defendants' timely objection to the continued reliance on the statute without an announcement, the trial court prevented error. Since there is no error this Court is not required to determine if it is harmless. Since

there is no available exception to the announcement rule, the trial court did not err in forbidding the plaintiff to use the adverse party witness statute in questioning Dr. Gonyaw.

Since it was not error to forbid the questioning of Dr. Gonyaw under the statute, the trial court did not err in denying plaintiff the right to make a separate record of what he would prove if allowed to use the statute. In reality, the statute only aids a party collaterally as the trial court noted:

"You can get out everything from *[sic]* your client, from this witness [with direct examination] that you could get out of cross-examination, but I have found very few lawyers have the ability to do it, but it is a very easy way to do it * * * . You can get statements from this witness that are going to be satisfactory to you".

Furthermore, although Dr. Gonyaw could not be directly impeached except under the statute, the plaintiff was free to contradict him. *Jones v Pere Marquette R Co,* 168 Mich 1, 15; 133 NW 993 (1911). The trial court also stated that if Dr. Gonyaw became evasive in answering plaintiff's questions, it would declare the doctor a hostile witness.

## II

Plaintiff next claims that the trial court improperly drew a distinction between osteopathic physicians and medical doctors. In support of this contention he points out several instances during the trial where the trial court prevented the plaintiff from asking questions concerning the differences in the training between osteopathic and medical doctors. The plaintiff also claims the trial court continued the distinction by instructing the jury

that the relevant malpractice standard was for *osteopathic* neurosurgeons and not simply neurosurgeons.

Plaintiff bases his argument on the fact that when the incident occurred Dr. Gonyaw and his neurosurgical instructor were the only practicing osteopathic neurosurgeons in Michigan. His contention is that these two men should not be entitled to establish their own standard of care from which to defend malpractice actions. While plaintiff's argument has merit, Michigan recognizes that specialists should be held to a national standard of care according to their school of medicine. See *Naccarato v Grob,* 384 Mich 248; 180 NW2d 788 (1970).

Plaintiff also argues that a patient has the right to expect the same standard of care from any person practicing medicine, whether the person's training is osteopathic or medical. In his appellate brief, plaintiff points out that the osteopathic and medical schools of medicine are slowly intergrating. Dr. Gonyaw's neurosurgical instructor testified that the mechanics of neurosurgery were similar between the two branches of medicine, but that the philosophies of the practitioners of the two branches differ. In fact, the instructor testified that he received his neurosurgical training in France under the guidance of medical doctors. It was further revealed that Dr. Gonyaw had studied neurosurgery almost exclusively from textbooks written by medical doctors.

Furthermore, the American Medical Association, the national association of medical doctors, is accepting osteopathic physicians that have met certain requirements into membership. Ten medical speciality boards, including neurology, have begun certifying osteopaths provided they have com-

pleted American Medical Association approved internships and residencies. The merger is occurring at the training level also; the medical school at Michigan State University trains both future medical doctors and osteopathic physicians in the same classes. See *Wheatley v Heideman,* 251 Iowa 695; 102 NW2d 343, 350–351 (1960).

However, no matter how appealing and convincing we find plaintiff's argument, it is for the Supreme Court and not the Court of Appeals to change the law of the State of Michigan. This Court is without authority to overrule decisions of the Supreme Court. *Siirila v Barrios,* 58 Mich App 721, 722–723; 228 NW2d 801 (1975), *Maxwell v Maxwell,* 15 Mich App 607, 618; 167 NW2d 114 (1969), *lv den,* 381 Mich 815 (1969). In *Bryant v Biggs,* 331 Mich 64; 49 NW2d 63 (1951), the Supreme Court said that the osteopathic and medical schools of medicine have their own standards and practices and should not be compared.[2] Although the Supreme Court modified the rule in *Frazier v*

---

[2] As a general rule, practitioners of a school of medicine should be judged by the standards of the school. *Janssen v Mulder,* 232 Mich 183; 205 NW 159; 25 NCCA 248 (1925), *see also* Annotation, 85 ALR2d 1022, 1023–1026, 61 Am Jur 2d, Physicians, Surgeons, and Other Healers, § 113, pp 235–236, 70 CJS, Physicians and Surgeons, § 44, p 953. In *Bryant v Biggs,* 331 Mich 64, 77; 49 NW2d 63 (1951), the Supreme Court rejected the proposition set forth in *Cook v Moats,* 121 Neb 769; 238 NW 529; 78 ALR 694 (1931), that in certain cases osteopathic and medical standards should be the same.

However, since that time a growing number of jurisdictions have begun to recognize an exception to the general rule when the standards are similar. *See, e.g., Hundley v St Francis Hospital,* 161 Cal App 2d 800; 327 P2d 131, 134; 80 ALR2d 360 (1958), *James v Falk,* 226 Ore 535; 360 P2d 546, 548; 85 ALR2d 1014 (1961), *Ison v McFall,* 55 Tenn App 326; 400 SW2d 243, 257–258 (1964), *Hart v Van Zandt,* 399 SW2d 791, 797–798 (Tex, 1965), *accord, Musachia v Terry,* 140 So 2d 605, 607 (Fla App, 1962), *see also* Annotation, 85 ALR2d 1022, 1026–1028. In the present case there was testimony from an osteopath that the procedures used in neurosurgery were similar between osteopaths and medical doctors. Where the procedures are similar, it is logical to hold both schools of medicine to the same standard of care. *James v Falk, supra.*

*Hurd,* 380 Mich 291; 157 NW2d 249 (1968), it is still the law of the State of Michigan until it is changed by the Supreme Court or the Legislature.

All that *Frazier v Hurd, supra,* at 297, accomplished was to allow expert testimony by a medical doctor in a malpractice case involving an osteopathic physician. It did not create a single standard of care for the two schools of medicine. This is supported by the legislative determination that the two groups can be admitted to practice their profession in Michigan on different bases, even if the two professions have similar goals.[3] The following statement "best" explains the current state of the law regarding the comparability of the two schools of medicine:

"It may be assumed that plaintiff's decedent was aware that defendants were osteopathic practitioners and for reasons satisfactory to himself he sought treatment from them for the cure or alleviation of his condition. In doing so he was, of course, charged with knowledge of the fact that he would follow the methods and practices observed in their system of treatment. Plaintiff is not in a position to complain that the methods and standards of practice customarily observed by another school were not followed." *Bryant v Biggs, supra,* at 72–73.

Plaintiff's principal expert witness was a medical doctor. In accordance with *Frazier v Hurd, supra,* he was allowed to testify as to what in his opinion competent neurosurgical procedures at the time were. He was qualified through the testimony of Dr. Gonyaw's instructor that medical and osteopathic neurosurgical procedures were similar.

---

[3] The applicable standards for licensing medical doctors are set forth in MCLA 338.53; MSA 14.533. On the other hand the applicable standards for licensing osteopathic physicians in Michigan are in MCLA 338.102; MSA 14.572.

There also was an indication that the medical
doctor had observed osteopathic physicians per-
form neurosurgery, although this was not pursued.

Following the expert's testimony concerning
what should have been done, plaintiff's counsel
attempted to have the expert compare the training
received by medical doctors and osteopathic physi-
cians. However, *Frazier v Hurd, supra,* does not
permit a member of one school of medicine to
comment on the training received by members of
the other school of medicine. It only allows a
member of one school of medicine to be an expert
witness at a malpractice trial of a member of the
other school of medicine. In any event, plaintiff
was able to indirectly bring out the desired com-
parison in training when his principal expert wit-
ness detailed his training.

Under the present state of the law as enunciated
by the Michigan Supreme Court and the Michigan
Legislature, the trial court did not err in prohibit-
ing a medical doctor from commenting on the
osteopathic standard of care or comparing a medi-
cal doctor's and osteopathic physician's training.
Furthermore, it did not err by instructing the jury
that it was to apply an osteopathic neurosurgeon's
standard of care rather than simply a neurosur-
geon's standard of care.

### III

Plaintiff finally claims that the trial court erred
in granting Martin Place Hospital a directed ver-
dict of no cause of action. This is based on the
theory that a reasonable and prudent hospital
would have determined that Dr. Gonyaw had inad-
equate training to be allowed to practice neurosur-
gery upon its premises. It is axiomatic that when
this Court reviews a motion for a directed verdict

the facts must be viewed in the light most favorable to the nonmoving party. *Kieft v Barr,* 391 Mich 77; 214 NW2d 838 (1974), *The Vogue v Shopping Centers, Inc,* 58 Mich App 421; 228 NW2d 403 (1975), *Oliver v St Clair Metal Products Co,* 45 Mich App 242; 206 NW2d 444 (1973).

In questioning the hospital's administrator, plaintiff brought out that the hospital had not verified the facts on Dr. Gonyaw's application for staff privileges. There were no letters in the file cross-checking his references or his past associations. Neither were there notations of telephone calls to his references or past associates as the administrator testified there should have been if such telephone calls had been made.

One of the hospital's primary functions is to screen its staff of physicians to "insure" that only competent physicians are allowed to practice in the hospital. *Purcell v Zimbelman,* 18 Ariz App 75; 500 P2d 335, 341 (1972), *Joiner v Mitchell County Hospital Authority,* 125 Ga App 1; 186 SE2d 307, 308; 51 ALR3d 976 (1971), *aff'd,* 229 Ga 140; 189 SE2d 412 (1972), *Darling v Charleston Community Memorial Hospital,* 33 Ill 2d 326; 211 NE2d 253, 260–261; 14 ALR3d 860 (1965), *cert den,* 383 US 946; 86 S Ct 1204; 16 L Ed 2d 209 (1966), see also Annotation, 51 ALR3d 981. In this regard the hospital's administrator admitted that the American Osteopathic Associations' guidelines for checking a physician's credentials were valid. Furthermore, he stated that Martin Place Hospital attempted to follow them although in this case he reluctantly agreed that it seemed that the hospital did not.

Viewing the evidence in the light most favorable to the plaintiff, it is clear that the hospital did not act as a reasonably prudent hospital in checking

Dr. Gonyaw's qualifications to be a staff member at the hospital. In fact they did not even follow their normal procedures. However, before the hospital can be held liable for negligently allowing Dr. Gonyaw to practice in the hospital, it must be shown that even if the hospital had made the recommended and acknowledged checks they would have denied staff privileges to Dr. Gonyaw. *Cf. Purcell v Zimbelman, supra,* 500 P2d at 342. On this point there is no evidence in support of plaintiff's contention.

Had Martin Place Hospital checked Dr. Gonyaw's qualifications they would have found him to be a qualified osteopathic neurosurgeon. He successfully completed a residency approved by the American Osteopathic Association. Although his application incorrectly stated that his neurosurgical residency had been from 1965 to 1968, he did begin his neurosurgical training in 1965. The training was in the form of a preceptorship with the same doctor that supervised his residency. This form of training was initially used because Dr. Gonyaw entered his neurosurgical training before the American Osteopathic Association had set up a formal neurosurgical residency program. He was given credit for this training by the American Osteopathic Association in certifying him as a neurosurgeon.

Since Dr. Gonyaw has met the requirements to be an osteopathic neurosurgeon, any further arguments that the plaintiff makes regarding the inadequacy of Dr. Gonyaw's training must be regarding a comparison of training received by medical and osteopathic neurosurgeons. However, since we have already concluded in part II of this opinion that any testimony comparing osteopathic and medical training is inappropriate, it is impossible

to introduce evidence to support this point. Although the plaintiff proved that the hospital failed to exercise reasonable care in checking Dr. Gonyaw's application for staff privileges, he failed to prove that if the hospital had made a reasonable check it would have rejected his application. *Purcell v Zimbelman, supra.* Consequently, the trial court did not err in granting a directed verdict in favor of Martin Place Hospital.

Affirmed. Costs to defendants.