BIVENS v DETROIT OSTEOPATHIC HOSPITAL

1. WITNESSES—COMPETENCY—EXPERT WITNESSES—COURT'S DISCRETION.

The competency of expert witnesses is ordinarily a matter for the discretion of the trial judge; it is incumbent on the person offering an expert witness to show that the witness possesses the necessary learning, knowledge, skill or practical experience to enable him competently to give such testimony.

2. PHYSICIANS AND SURGEONS—STANDARD OF CARE—SCHOOLS OF MEDICINE.

A physician is to be judged by his or her ability to adhere to the requisite standard of care of the school of medical thought to which he or she adheres where there are different schools of medical thought.

3. PHYSICIANS AND SURGEONS—SCHOOLS OF MEDICINE—WITNESSES—STANDARD OF CARE.

A member of one school of medical thought may testify as to the standard of care applicable to an individual adhering to another school of medical thought where the proffered witness is familiar with the applicable standards of the other school.

---

REFERENCES FOR POINTS IN HEADNOTES

[1] 31 Am Jur 2d, Expert and Opinion Evidence §§ 26, 27, 31.
[2] 61 Am Jur 2d, Physicians, Surgeons, and Other Healers § 113.
[3, 4] 61 Am Jur 2d, Physicians, Surgeons, and Other Healers § 205.
  Competency of physician or surgeon of school of practice other than that to which defendant belongs to testify in malpractice case. 85 ALR2d 1022.
[5] 40 Am Jur 2d, Hospitals and Asylums § 28.
[6] 40 Am Jur 2d, Hospitals and Asylums § 26.
[7] 31 Am Jur 2d, Expert and Opinion Evidence § 19.
[8] 31 Am Jur 2d, Expert and Opinion Evidence § 185.
[9, 10] 31 Am Jur 2d, Expert and Opinion Evidence §§ 66–68.
  Use of medical or other scientific treatises in cross examination of expert witnesses. 60 ALR2d 77.
[11] 29 Am Jur 2d, Evidence §§ 894, 898.
  30 Am Jur 2d, Evidence § 1112.

4. Physicians and Surgeons—Standard of Care—Malpractice—
Witnesses.

A medical doctor-thoracic surgeon may testify in a malpractice
action as to the standard of care for an osteopathic doctor-
thoracic surgeon where his testimony establishes that he is
familiar with osteopathic thoracic surgery procedures and stan-
dards.

5. Appeal and Error—Jury Verdicts—Inconsistent Verdicts—
Hospitals—Malpractice—Employer—Employee—Negli-
gence.

A jury verdict in a medical malpractice action that finds no cause
of action against a defendant doctor, an employee of the defend-
ant hospital, but finds the defendant hospital liable is not
inconsistent where the plaintiff's complaint separately alleged
negligence on the part of the doctor and the hospital.

6. Hospitals—Standard of Care—Hospital Staff—Reasonable
Care—Ordinary Care.

The proper standard of care expected of a hospital staff toward
hospital patients is such reasonable care and attention for their
safety as their mental and physical condition may require;
hospitals are liable for want of ordinary care toward their
patients.

7. Witnesses—Expert Witnesses—Physicians and Surgeons—Hos-
pitals—Malpractice.

Expert testimony is an absolute prerequisite to a patient's right
to recover for alleged malpractice from either a physician or a
hospital.

8. Appeal and Error—Negligence—Sufficient Basis—Hospitals
— Malpractice—Expert Testimony.

A sufficient basis existed for a jury's finding of negligence on the
part of a defendant hospital in a malpractice action where the
expert testimony and the evidence in the case indicated: that
various members of the defendant hospital's staff administered
and prescribed various drugs for the decedent, that the drugs
aggravated the decedent's condition by making his breathing
more difficult, that despite his failing condition the decedent
was left alone for a considerable period of time, and that the
suctioning of blood from the decedent's lungs ordered by a
doctor was actually done only twice during the ten and a half
hours preceding his death.

9. Evidence—Medical Books—Substantive Evidence—Malprac-
   tice—Cross-Examination—Expert Witnesses—Authoritative
   Publications—Judicial Notice.

> The contents of medical books are generally not allowed by the courts as substantive evidence in a malpractice action, however, medical textbooks or other publications may be used to impeach an expert witness on cross-examination if the expert recognizes the publication as authoritative, or if the trial court takes judicial notice of the publication as authoritative.

10. Appeal and Error—Evidence—Medical Books—Substantive
    Evidence—Reversible Error—Malpractice—Negligence—
    No Cause of Action.

> The admission of the contents of a medical book as substantive evidence in a malpractice action is not reversible error where such evidence went to the negligence of the defendant doctor and not to the negligence of the defendant hospital, and where the jury found no cause of action as to the defendant doctor.

11. Evidence—Mortality Tables—Death Actions—Expectancy of
    Life—Previous Health Condition.

> Mortality tables are admissible in an action for a death to establish the decedent's expectancy of life; the jury may also use such tables upon their disposition of a disputed fact question regarding the previous condition of health of the person whose expectancy is at issue.

Appeal from Wayne, Charles Kaufman, J. Submitted May 10, 1977, at Detroit. (Docket No. 27560.) Decided August 22, 1977.

Complaint by Nannie Bivens, administratrix of the estate of James Bivens, deceased, against Detroit Osteopathic Hospital, Donald J. Evans, D. O., and John H. Sloan, D. O., to recover damages for malpractice resulting in the death of the deceased. Prior to trial, plaintiff settled with defendant Evans. The jury returned a verdict of no cause of action against defendant Sloan and found the defendant hospital liable. Defendant hospital appeals. Affirmed.

*Zeff & Zeff (Edward Grebs,* of counsel), for plaintiff.

*Dice, Sweeney and Sullivan, P. C.,* for defendant.

Before: N. J. Kaufman, P. J., and V. J. Brennan and D. C. Riley, JJ.

V. J. Brennan, J. This case involves a malpractice action to recover damages for the death of James Bivens at 6:10 a.m., June 6, 1968, at defendant Detroit Osteopathic Hospital at 12523 Third Street in the City of Highland Park. Originally named as codefendants in the complaint were Dr. Donald J. Evans, D. O. and Dr. John H. Sloan, D. O., a resident surgeon in training at defendant hospital at the time of Bivens' death.

Prior to trial, plaintiff Nannie Bivens settled with Dr. Evans for the limits of his malpractice liability insurance policy. Following a jury trial which commenced October 23, 1975, the jury returned a verdict on November 7, 1975, finding no cause of action against defendant Dr. Sloan but finding the hospital liable in the amount of $300,-000.

Defendant hospital filed a motion for judgment notwithstanding the verdict or, in the alternative, for a new trial on December 1, 1975, which motion was denied by the trial court on February 9, 1976. The hospital then filed a claim of appeal on February 11, 1976.

The facts indicate that decedent entered the defendant hospital on May 28, 1968, for some tests. While in the hospital, an X-ray of Bivens' lungs was taken which showed a suspicious mass in the right lobe of the lung. Dr. Evans was called in for consultation. Dr. Evans examined the X-rays and determined that the only way he could get the

difficulty diagnosed was by bronchoscopy. This procedure involved passing a tube down the throat into the lungs, viewing the condition of the lungs and removing samples of lung tissue.

The operation was performed by Dr. Evans on June 5, 1968. While using a bronchoscope to perform the bronchoscopy, he performed a biopsy with cupped forceps in order to obtain some tissue and in doing so he cut a vein in the right lung. This situation caused a massive amount of blood to fill the air sacs of Bivens' lungs. Dr. Evans then passed absorbent guaze down through the bronchoscope to stop the bleeding, and this procedure did stop the bleeding for the moment. Subsequent X-rays revealed that the air sacs were still filled with blood.

Dr. Evans then performed a tracheotomy so an artificial respirator could provide the decedent with oxygen and so other equipment could be used to suction the blood out of the air passages in his lungs. Bivens died the following day from a lack of oxygen.

Defendant brings several allegations of error on appeal. We will address each claim.

Defendant first alleges that error was committed because there was no evidence of any osteopathic standard of care where plaintiff's expert witness as to such standard of care was classified as a medical doctor and not an osteopathic doctor.

Dr. Richard Overholt, M. D., testified for the plaintiff as follows:

"Q [Plaintiff's counsel] Doctor, is there a difference between a thoracic surgeon classified as a medical doctor and a thoracic surgeon classified as an osteopathic doctor?

"A I haven't thought of that. I can't answer it.

"Q Doctor, in your teaching in your supervision of

residents, have you taught and supervised osteopathic physicians?

"A Not formally. We have had osteopathic physicians that have gone here to observe and to find out how we [medical doctors] manage certain diseases, and there is one osteopathic physician that came down from the state of Maine, from Portland, that was here and took—and observed our [medical doctors'] method of doing a bronchoscopy."

Prior to the reading of Dr. Overholt's deposition, defendants objected to admission of the doctor's testimony based on the question raised on appeal. In response, the court ruled:

"THE COURT: Well, let me rule this way: To the extent that Dr. Overholt is an expert in the field dealing with the thoracic area having to do with the lungs and aspirations and tracheotomies and bronchoscopies, I will take his testimony to the extent that he can testify physiologically. Now, it's inconceivable to me that if Dr. Overholt would testify that physiologically certain things definitely cannot be done or they will result in death, it is inconceivable to me the standard of care of osteopathic physicians would be to engage in such activities that would bring on death. Also to the extent that the physiologies of people are the same, whether being treated by an M. D. or an osteopath would have been taken into consideration. I will, therefore, permit the testimony and leave its weight to the jury. At a subsequent time, on proper request, I will advise the jury that the standard of care may be different in different fields of medicine, such as osteopaths and M. D.'s. So we will proceed."

Dr. Overholt testified that there is no difference between a medical doctor performing a bronchoscopy as compared to an osteopathic doctor. He further testified that the hospital records indicate that the bleeding was not stopped, and the autopsy showed that there was blood in the bronchial

system that included many of the air tubes to the lungs. He believed the condition had not been checked adequately, because bleeding into the hollow tube system continued and filled up these tubes with clots which prevented proper ventilation.

The Michigan Supreme Court recently discussed in detail the issue of competency of expert witnesses. *Siirila v Barrios,* 398 Mich 576; 248 NW2d 171 (1976). The Court there stated:

"Ordinarily, the qualification of competency of expert witnesses is a matter for the discretion of the trial judge, *Ives v Leonard,* 50 Mich 296, 299; 15 NW 463 (1883), 'and it is incumbent on the person offering an expert witness to show that the witness possesses the necessary learning, knowledge, skill or practical experience to enable him competently to give such testimony'. 11 Michigan Law & Practice, Evidence, § 260, p 484. See *Moore v Lederle Laboratories,* 392 Mich 289, 295–296; 220 NW2d 400 (1974).

"Generally, where there are different schools of medical thought, the physician is to be judged by his or her ability to adhere to the requisite standard of care of the school to which he or she adheres. Prosser, Law of Torts (4th ed), p 163. The rationale is that '[p]ractitioners of other schools of treatment, no matter how well qualified by study and experience in their own methods and standards but lacking the requisite knowledge of the specific matter in question [i.e., the ordinary methods and standards of practice of another school], could not competently express opinions'. *Bryant v Biggs,* 331 Mich 64, 72; 49 NW2d 63 (1951). However, it is clear that a member of one school of thought may testify as to the standard of care applicable to an individual adhering to another school as long as the proffered witness is familiar with the applicable standards of defendant's school." *Siirila v Barrios, supra,* at 591.

Regarding the familiarity of the expert witness with the applicable standards of defendant's

school, the Court relied upon its earlier decision in *Frazier v Hurd,* 380 Mich 291; 157 NW2d 249 (1968):

"We do not read our precedents to preclude opinion testimony of compliance or failure of compliance with the standards of a defendant's profession except only from a member of that profession. We never have addressed our decisional attention to this specific question. However, it is significant that on a number of occasions in which we have discussed opinion testimony in malpractice cases, we have suggested that opinions of one not a practitioner of defendant's profession would have been admissible had there been a showing that the offered witness had knowledge of the applicable standards of the defendant's profession. See, for example, *Zoterell v Repp,* 187 Mich 319, 330; 153 NW 692 (1915), *Sima v Wright,* 268 Mich 352, 356; 256 NW 349 (1934), *Facer v Lewis,* 326 Mich 702, 713–714; 40 NW2d 457 (1950), and *Pedler v Emmerson,* 331 Mich 78; 49 NW2d 70 (1951)." *Frazier v Hurd, supra,* at 297.

*Frazier* allowed testimony by a medical doctor as to the standard of care of an osteopathic physician. See also *Ferguson v Gonyaw,* 64 Mich App 685, 696; 236 NW2d 543 (1975) [neurosurgeon permitted to testify regarding the standard of care of osteopathic neurosurgeon after demonstrating that medical and osteopathic neurosurgical procedures were very similar].

In the present case, Dr. Overholt, a medical doctor-thoracic surgeon, testified as to the standard of care for an osteopathic doctor-thoracic surgeon. Clearly, under *Frazier* and *Ferguson,* his testimony is not impermissible so long as his testimony establishes that he was familiar with osteopathic thoracic surgery procedures and standards.

When asked to distinguish between a thoracic surgeon classified as a medical doctor and a thora-

cic surgeon classified as an osteopathic doctor, Dr. Overholt answered: "I haven't thought of it. I can't answer it". Immediately afterward, he did comment upon the differences in training between a medical doctor and an osteopathic doctor. He also admitted having worked with certain osteopathic physicians in his capacity as a thoracic surgeon. Later, Dr. Overholt testified that he did not believe performing a bronchoscopy would be different for an osteopathic doctor as compared to a medical doctor.

In any case, because the liability of Dr. Evans was not an issue for the jury and since the jury found no cause of action against Dr. Sloan, we do not perceive Dr. Overholt's testimony as to the standard of care for an osteopathic thoracic surgeon as determinative of whether defendant hospital was liable for decedent's death. We find no prejudice to defendant hospital. *Leitelt Iron Works v DeVries,* 369 Mich 47, 55; 119 NW2d 101 (1963).

Defendant next contends that the jury's verdict, which found no cause of action as to Dr. Sloan, an employee of the hospital, but found the employer hospital liable, was inconsistent, thus entitling the hospital to a reversal.

Testimony at trial indicated that decedent was returned to his hospital room between 7:30 and 8 p.m. and that Dr. Evans left orders for the suctioning of blood from decedent's lungs. Suction was performed at 9 p.m. and a large amount of blood was removed. Another suctioning occurred at 12 midnight and then none after that point. As to medication, decedent was given Valium, Solu-Cortef, Polycillin and Dilantin. Dilantin is an anticonvulsive drug.

Between 12 midnight and 6 a.m., hospital night interns and medical residents were present and

could have assisted decedent. Hospital records do not show any call to a thoracic surgeon, but do indicate that no doctor or thoracic surgeon saw decedent between midnight and 6 a.m.

We note immediately the fact that the verdict is not per se inconsistent simply because the jury found no cause of action as to the defendant hospital's employee and yet found defendant hospital employer liable. *Ravenis v Detroit General Hospital,* 63 Mich App 79; 234 NW2d 411 (1975). We held in *Ravenis,* a medical malpractice action brought against both a defendant hospital and an employee ophthalmology resident, that where plaintiff patients separately alleged negligence on the part of the hospital, a finding that the hospital's ophthalmology resident was not negligent did not preclude finding negligence on the part of the hospital. *Ravenis v Detroit General Hospital, supra,* at 84. Consequently, we must determine whether defendant hospital, independent of the actions of Dr. Sloan, breached a duty of care to plaintiff's decedent.

In determining this question, we will not distinguish an osteopathic as opposed to medical standard of care. We find no support for such a proposition. The proper standard of care expected of a hospital staff toward hospital patients is such reasonable care and attention for their safety as their mental and physical condition may require. See *Mounds Park Hospital v Von Eye,* 245 F2d 756, 759 (CA 8, 1957), *Sylvester v Northwestern Hospital of Minneapolis,* 236 Minn 384, 386; 53 NW2d 17, 19 (1952). Hospitals are liable for want of ordinary care toward their patients. *New Biloxi Hospital, Inc v Frazier,* 245 Miss 185, 196; 146 So 2d 882, 887 (1962). The amount of care required varies according to the particular circumstances.

*Marks v St. Francis Hospital and School of Nursing, Inc,* 179 Kan 268, 272; 294 P2d 258, 261 (1956).

We also recognize that expert testimony is an absolute prerequisite to a patient's right to recover for alleged malpractice from either a physician or a hospital. *Brandon v Art Centre Hospital,* 366 F2d 369, 371 (CA 6, 1966), *Lince v Monson,* 363 Mich 135, 139; 108 NW2d 845 (1961). Expert testimony in the instant case included testimony by Dr. Sloan that various members of the defendant hospital's staff administered and prescribed various drugs for decedent. Dr. Overholt also testified that the drugs aggravated decedent's condition by making his breathing more difficult. Evidence also exists that, despite his failing condition, decedent was left alone for a considerable period of time and that the suctioning ordered by Dr. Evans was actually done only twice before decedent's death during the period between 7:30 p.m. and 6 a.m.

We thus believe that a sufficient basis exists for the jury's finding of negligence on the part of defendant hospital. Given such basis, the verdict was possible, regardless of their finding Dr. Sloan innocent of negligence. We can find no merit in defendant hospital's claim of inconsistency.

Defendant contends thirdly that the trial court committed reversible error by allowing plaintiff's counsel to read to the jury excerpts from a medical textbook.

The trial court permitted plaintiff's counsel to read to the jury excerpts from the medical textbook entitled *Bronchoesophagology,* by Jackson and Jackson. He allowed a section of three pages of the book to be read in closing argument, not during cross-examination for the purpose of impeachment. He admitted the textbook section as

substantive evidence and instructed the jurors that they should consider the textbook in this way.

As to the Jackson textbook, Dr. Overholt testified that he interned under Chevalier Jackson, the man who invented the bronchoscope and who co-authored the book. Dr. Evans also testified that Jackson was the father of bronchoscopy, an opinion which was corroborated by Dr. Sloan. When the book was shown to Dr. Sloan and the court was asked to take judicial notice of the authoritativeness of the book, the court's following response occurred:

"The fact that this book does precede 1968 and the fact that Dr. Overholt has indicated that this gentleman is a pioneer, an authority on the subject, and Dr. Overholt himself has been qualified as an authority on this subject, I am going to receive it under the * * * purview of *Jones* against *Bloom* case without indicating to the jury that this is the last word."

Regarding the reason for seeking to admit the evidence, plaintiff's counsel explained:

"And partly our case not only rests on the fact that the bronchoscopy was done negligently in the first instance, but that authoritative texts in the field suggest and indicate that further bronchoscopic work may have been indicated in that period of time in which Dr. Sloan was apparently the only thoracic surgeon available.

"For that reason we would ask that—And there are indications further in this text as to treatment medically with drugs and anesthesia techniques which are positively indicated, absolutely indicated in conjunction with and following bronchoscopic examination and are very effective of what we feel is the standard of care surrounding the whole question of treatment of the bronchi, the trachea and this kind of injury to the chest."

The court thus agreed to receive the book into evidence, though suggesting that the portion not be read to the jury during the cross-examination of Dr. Sloan, but rather in closing argument.

Michigan courts have traditionally restricted the reading of textbooks to the jury. *People v Hall,* 48 Mich 482, 490–491; 12 NW 665 (1882), *Pinney v Cahill,* 48 Mich 584, 586–587; 12 NW 862 (1882), *People v Vanderhoof,* 71 Mich 158, 179–180; 39 NW 28 (1888), *Anderson v Jersey Creamery Co,* 278 Mich 396, 402; 270 NW 725 (1936). Generally, courts have not allowed the contents of medical books to be admitted as substantive evidence, simply because their authors were not present and subject to cross-examination. However, one exception did. emerge, which has recently been reenforced by the Michigan Supreme Court. *Jones v Bloom,* 388 Mich 98; 200 NW2d 196 (1972). The Court noted there that textbooks might be used for purposes of impeaching an expert witness on cross-examination:

"We, therefore, hold that medical textbooks or other publications may be used to cross-examine expert witnesses if the expert recognizes the publication as authoritative, or if the trial court takes judicial notice of the publication as authoritative." *Jones v Bloom, supra,* at 118.

Further, the Court indicated in dictum that a clear trend exists toward admitting textbooks as substantive evidence:

"Moreover, the drafters of the Model Code of Evidence and the Uniform Rules of Evidence would go beyond this rule and permit the admissibility of textbooks as substantive evidence. Thus, the clear trend of the courts and the commentators is to permit a liberalization of the restrictions against cross-examination and

allow the cross-examination of medical experts by the use of authoritative medical textbooks. We, therefore, hold that the trial court committed error in excluding plaintiff's cross-examination of defendants' expert witness by the use of such textbooks. To the extent that earlier Michigan cases prevented such cross-examination, they are overruled." *Jones v Bloom, supra,* at 120.

In the instant case, the first mention of the disputed textbook evidence was during the cross-examination of Dr. Sloan. When asked whether he was familiar with Jackson's book, Dr. Sloan said that he was not. Plaintiff's counsel later showed a copy of the book to Dr. Sloan, who again denied familiarity with it. In the discussion which followed a defense objection to this line of questioning, the fact was reemphasized that Dr. Evans and Dr. Overholt had recognized the book's authors as pioneers in the field of bronchoscopy. As already noted, certain portions of the book were subsequently admitted into evidence.

We believe the trial court exceeded the authority provided by *Jones.* The court's allowance of the text material as "impeachment evidence" was clearly proper under *Jones.* However, when he provided the material might be allowed "for whatever substantive value it may have", he exceeded the stated perimeters of *Jones* by giving effect to the *Jones* dicta as well. We believe this extension was error.

Nevertheless, upon examining the record, we find that the effect of reading this section of the textbook was probably minimal. This testimony and the textbook material went to the negligence of the doctors not to the negligence of the hospital. Consequently, if error occurred, the error was not reversible because the jury found no cause as to Dr. Sloan. Further, defendant could have produced

rebuttal evidence had it felt such a step advisable. See also, Michigan Proposed Rules of Evidence, MRE 803(18), which will explicitly allow such treatises as substantive evidence. Thus, though we believe the trial court committed error under *Jones* by allowing the textbook material to be used as possible substantive evidence, we find no reversible error.

Defendant next contends the trial court erred in permitting plaintiff's counsel to use the standard mortality table against a defendant whose alleged tortious act occurred after the alleged tortious acts of others had increased the likelihood of death.

As to use of the mortality tables to establish damages, the trial court instructed the jury:

"Now, if you find for the plaintiff, then in determining the amount of damages you may consider the length of time the plaintiff probably would have received financial and other benefits from the deceased, taking into consideration the number of years he was likely to have lived and how long she is likely to live. In making this determination you may consider the mortality table which is a part of our statutes. The table shows the life expectancy for ordinarily healthy persons of the age of forty-eight to be approximately twenty-five years. Now, these mortality figures are not conclusive as to the question of life expectancy but together with the other evidence are a proper matter for your consideration in determining that question.

"Now, if you decide that the plaintiff will sustain damage in the future, you must reduce that amount to its present case value. The amount of damages you determine she will sustain the first year is to be divided by 1.05. The amount of damages you determine she will sustain the second year is to be divided by 1.10. The amount she will sustain in the third year is to be divided by 1.15. You then continue to use a similar procedure for each additional year you determine she will sustain damages. The total of your yearly computa-

tions is the present cash value of plaintiff's future damages.

"If you decide plaintiff has suffered damages, you should determine when those damages accrued and add interest from then to the date the Complaint was filed."

Defendant's argument is without merit. Numerous Michigan cases have held mortality tables to be admissible to establish decedent's expectancy of life in an action for death. See *Jones v McMillan,* 129 Mich 86, 90–92; 88 NW 206 (1901), *Philip v Heraty,* 135 Mich 446, 453; 97 NW 963 (1904).

Michigan courts have also held that where a dispute exists as to the previous condition of health of the person whose expectancy is at issue, mortality tables are admissible for use by the jury depending upon their disposition of the disputed fact question. *Jenkins v Canfield,* 282 Mich 277; 276 NW 447 (1937).

In *Jenkins,* testimony was presented on the one hand which indicated that the decedent, who died in a fatal accident, had suffered from a heart condition and would have lived only five years even if the accident had not occurred. On the other hand, testimony was given by decedent's wife that to her knowledge decedent was always in good health. The Court in *Jenkins* found that the condition of the deceased's health was one for the jury and that on the whole record, no error occurred by allowing the jury to use the mortality tables. *Jenkins v Canfield, supra,* at 279–282.

We find the circumstances involved in this case similar to those in *Jenkins.* A dispute existed here over decedent's state of health before he entered the hospital—whether he suffered from a hearing disability or stomach trouble. However, the real issue raised by defendant hospital is whether credit should be given the hospital for harm done

decedent prior to the beginning of post-operative care. The authorities which the defendant cites will not resolve the question. In each of those cases, the situation involved an injured person already suffering from a health condition likely to reduce his life expectancy before initial contact with the party liable for the ultimate death. On the other hand, defendant hospital here had contact with decedent from the time he walked in the door to the time of his death, and no proof was offered to show that decedent was suffering from a health condition likely to reduce his life expectancy prior to that contact.

Therefore, on the basis of *Jenkins,* we do not believe error was committed when the trial court instructed the jury on use of the mortality tables.

Defendant claims finally that the trial court erred in instructing the jury that every act or omission by a physician likely to cause death or a serious unintended injury constituted malpractice.

In his instruction to the jury, the trial court charged the jury over defendant's objection: "If what a doctor does or does not do will likely cause death or serious unintended injury, then it cannot be claimed that that act or omission of the doctor is within the standard of care of his profession".

However, the trial court provided the jury with various other instructions relevant to standard of care and malpractice:

"Now, I am going to give you the definitions of some important legal terms that have been used and will be used in describing the claims of the parties and in telling you what they must prove. Listen carefully to these definitions so that you will understand the terms. Okay. First, the term 'malpractice' has been used and I am going to give you what we would consider a legal definition for your purposes. Malpractice is the failure

of a physician to render to his patient care and treatment equal in quality to that which is standard for the community. It has sometimes been referred to as medical negligence, but the definition I just gave you is what we mean by malpractice.

"Now, it was the duty of the defendants in connection with this occurrence to use ordinary care for the safety of the plaintiff. And when I use the words 'ordinary care,' I mean to have conformed to the standard of practice applicable to the situation that you find in this case.

\* \* \*

"Now, you are to determine the standard of care for each defendant from all the evidence. The standard of care may be deduced from the testimony of plaintiff's witnesses, from the defendants themselves, and from texts and books properly admitted. You are to determine the standard of care applicable to each defendant and must then compare his conduct to the standard. If the defendant's conduct does not meet the standard, you must find that defendant is guilty of malpractice."

The trial court's instructions included guidance for the jury as to standard of care and a definition of malpractice. Upon our reading of the full instructional record, we do not find defendant to have been prejudiced by the court's statement. We therefore find insufficient ground to reverse on this claim.

Having thus reviewed all of defendant's allegations of error and finding them an inadequate ground on which to reverse the verdict against defendant hospital, we affirm.

Affirmed. Costs to plaintiff.